**STANDARD FEDERAL BANK (formerly known as Heritage Federal Savings Bank), Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 92–844C.**

United States Court of Federal Claims.

Sept. 9, 2004.

Edward L. Lublin, Blank Rome LLP, Washington, D.C., for the plaintiff. Michael Joseph, Lawrence S. Sher, Blank Rome LLP, Washington, D.C., of counsel.

Ashley N. Bailey, Trial Attorney; Jeanne E. Davidson, Deputy Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. Gary J. Dernelle, Richard B. Evans and Marc S. Sacks, of counsel.

## OPINION

HORN, Judge.

This is the second opinion issued by this court in this *Winstar*-related case. *See Standard Fed. Bank v. United States*, 51 Fed.Cl. 695 (2002). In a filing submitted to the court, the defendant stated that it had "determined based upon the facts in this case and established legal principles, not to contest the existence of a contract or breach." The defendant, however, also stated: "[W]e do not concede that the breach caused any damages or that the named plaintiff is the real party in interest." On February 25, 2002, this court issued an opinion, granting plaintiff's motion for partial summary judgment and denying defendant's cross-motion for partial summary judgment on liability, as well as defendant's supplemental motion for summary judgment. *Id.* at 712. Specifically, the court found that Standard Federal Bank is the successor in interest to Heritage with regard to the claims at issue. *Id.*

Plaintiff has made three damages claims: a claim for lost profits stemming from the breach of contract, a claim for the hypothetical cost of raising replacement capital, and a claim for reliance damages. The defendant

filed a motion for summary judgment with respect to all three of the plaintiff's damages claims, which the plaintiff opposed. Defendant maintained that plaintiff's theories of damages could not result in an award of any damages as a matter of law. To determine if plaintiff could establish damages, and in the interest of judicial economy and efficiency for all the parties, the court held an adversarial, mini-hearing, during which, plaintiff's experts testified and were cross-examined regarding the damages models upon which plaintiff's damages claims are premised. Both parties also were asked to submit post-hearing briefs. With this approach, the court hoped to avoid a lengthy trial to the benefit of all. The court indicated that, in the event the issues could not be resolved with a mini-hearing, a full trial on damages subsequently would be scheduled.

## FINDINGS OF FACT

The events that precipitated this and the other *Winstar*-related cases also filed in this court were described in the plurality opinion of the United States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 844–48, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). While a full recitation of those events is unnecessary in this opinion, an outline of the facts and the regulatory system in effect during the critical period of time may be useful to place the instant case in context. The starting point is the passage of three statutes during the Great Depression intended to stabilize the savings and loan industry:

The Federal Home Loan Bank Act created the Federal Home Loan Bank Board (Bank Board), which was authorized to channel funds to thrifts for loans on houses and for preventing foreclosures on them. Ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1421–1449 (1988 ed.)); *see also* [H.R.Rep. No. 101–54, pt. 1, 292 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 88]. Next, the Home Owners' Loan Act of 1933 authorized the Bank Board to charter and regulate federal savings and loan associations. Ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988 ed.)). Finally, the National Housing Act created the Federal Savings and Loan Insurance Corpora-

tion (FSLIC), under the Bank Board's authority, with responsibility to insure thrift deposits and regulate all federally insured thrifts. Ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.)).

*United States v. Winstar Corp.*, 518 U.S. at 844, 116 S.Ct. 2432.

The regulatory system outlined by these three statutes worked well until the late 1970s and early 1980s. *Id.* at 845, 116 S.Ct. 2432. Between 1981 and 1983, however, 435 savings and loan operations failed. *Id.* Efforts by the government to deregulate the industry only exacerbated the problem, and by 1985, the estimated cost to the government to close insolvent thrifts rose to $15.8 billion, $11.25 billion more than the Federal Savings and Loan Insurance Corporation's (FSLIC) total reserves. *Id.* at 847, 116 S.Ct. 2432.

Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers." *See* GAO, Solutions to the Thrift Industry Problem 52; L. White, The S & L Debacle: Public Policy Lessons for Bank and Thrift Regulation 157 (1991) (White). Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash contributions from FSLIC were often part of a transaction. *See* M. Lowy, High Rollers: Inside the Savings and Loan Debacle 37 (1991) (Lowy). Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

*Id.* at 847–48, 116 S.Ct. 2432 (footnote omitted).

In 1985, Heritage Federal Savings Bank (Heritage), located in Michigan, became a federally chartered mutual savings bank. Heritage's principal business consisted of the acceptance of deposits from the general public and the origination of residential mortgage loans.[1] Until 1986, Heritage had historically concentrated its business activities in southeastern Michigan. Until 1986, Heritage had primarily grown through internal growth, not through merger or acquisition activity.

On October 31, 1986, Heritage acquired Family Federal Savings and Loan Association of Saginaw, Michigan (Family Federal), a failing thrift, in a FSLIC-assisted merger. Family Federal, a federally chartered, mutually owned savings association, began experiencing operating losses in 1980, which continued until its acquisition by Heritage. In June, 1980, Family Federal had a net worth of $17.4 million, which had declined to $1.4 million as of August 31, 1986. At the time of the acquisition, Family Federal's regulatory net worth was $1.0 million. Family Federal's operating losses stemmed, in part, from its large volume of short-term maturing liabilities compared to its small volume of short-term interest earning assets. The negative gap in Family's short-term maturity structure left the institution vulnerable to increases in interest rates.

Two agreements were executed in conjunction with Heritage's acquisition of Family. First, on October 31, 1986, Heritage and Family entered into a "Merger Agreement and Plan of Merger," through which Heritage acquired all of the assets and liabilities of Family. According to plaintiff, Heritage assumed approximately $37,000,000.00 in liabilities in the merger. Second, on the same date, Heritage and FSLIC entered into an "Assistance Agreement." Under the Assistance Agreement, Heritage received an initial cash contribution from the FSLIC in the amount of $12,900,000.00.

Prior to the execution of the Assistance Agreement and the Merger Agreement, the Federal Home Loan Bank Board (Bank Board) issued three resolutions approving Heritage's merger with Family Federal. Resolution 86–1141 authorized the Secretary of the Bank Board to issue a forbearance letter to Heritage regarding supervisory forbearance by the Bank Board and the FSLIC of certain regulatory requirements. Resolution 86–1142 authorized the Director of the FSLIC to take necessary action and incur and pay expenditures in order to fulfill the rights, duties and obligations of the FSLIC under the Assistance Agreement. Resolution No. 86–1143 approved the merger of Family Federal with Heritage.

On December 4, 1986, the FHLBB Secretary issued the forbearance letter authorized by Board Resolution No. 86–1141, which contained forbearances concerning goodwill accounting and the FSLIC cash assistance. First, employing the purchase method of accounting, Heritage was permitted to record the amount by which the fair market value of the liabilities of Family Federal exceeded the fair market value of its assets on the date of the acquisition as an unidentifiable, intangible asset, known as supervisory goodwill, which was to be amortized over 25 years for regulatory accounting purposes. From Heritage's perspective, accounting for supervisory goodwill as regulatory capital was beneficial because it raised the institution's reserves, and, therefore, allowed the thrift to leverage more loans. Second, the FSLIC cash contribution to be made to Heritage, pursuant to the Assistance Agreement, was, for regulatory accounting purposes, to be credited to Heritage's regulatory net worth account.[2]

The acquisition increased Heritage's assets by $335 million and expanded Heritage's branch network into northern Michigan through the addition of 23 branch offices. Following its acquisition of Family Federal, Heritage had approximately $916 million in total assets, $40.8 million of regulatory net worth, and a regulatory capital ratio of 4.5

---

1. As of June 30, 1986, Heritage had assets valued at approximately $507 million of assets under generally accepted accounting principles (GAAP) ($516 million under regulatory accounting principles (RAP)).

2. Under 12 C.F.R. § 563.13 (1986), thrifts were required to keep a certain percentage of their net worth in reserve.

percent as of December 31, 1986, which was in excess of the 3.0 percent regulatory minimum capital requirement in effect at the time. As of the same date, Heritage's GAAP capital totaled $21.2 million, or 2.3 percent of total assets.

Heritage marked to market Family Federal's assets and liabilities to their market values, which resulted in $36.9 million of excess liabilities, which was recorded as RAP goodwill. Under GAAP, any FSLIC assistance received required a reduction of the amount of goodwill recorded by the same amount. Therefore, Heritage recorded $24 million of goodwill under GAAP ($36.9 million less $12.9 million), $11.8 million of which resulted from adjusting long-term interest-earning assets and shorter-term interest bearing deposits to their fair values. Heritage commenced amortizing the $36.9 million of RAP goodwill recorded under the purchase method of accounting in the Family Federal acquisition on a straight-line basis over a 25–year period, pursuant to RAP. Heritage amortized GAAP goodwill over the life of the long-term, interest-earning assets and accreted the net discounts over the related estimated lives of those assets. Heritage amortized the goodwill in this manner until Heritage was acquired by Standard Federal in 1993.

Congress enacted FIRREA in August of 1989. Pub.L. No. 101–73, 103 Stat. 183. FIRREA required the promulgation of new capital standards for the savings and loan industry, which did not allow thrifts to use supervisory goodwill in calculating their regulatory net worth, following a phase-out period of five years. *See* 12 U.S.C. §§ 1464(t)(2)(A), 1464(t)(3)(A), 1464(t)(9)(A). In addition, according to definitions promulgated in regulations issued pursuant to FIRREA, thrifts were no longer allowed to count capital contributions received from the FSLIC toward their capital requirements. *See* 12 C.F.R. § 567.1(w) (1990).

Specifically, among other things, FIRREA required the Director of the Office of Thrift Supervision (OTS) to promulgate regulations establishing a "core" capital requirement, a "tangible" capital requirement and a "risk-based" capital requirement for thrifts. Under the regulations, thrifts were required to maintain core capital of not less than 3 percent of adjusted assets. Savings institutions were required to maintain tangible capital, which is core capital less certain intangible assets, such as goodwill, in an amount not less than 1.5 percent of total assets. Finally, savings institutions were required to maintain "total capital" (core capital and other "supplementary capital") in an amount greater than, or equal to, 6.4 percent of risk-weighted assets at December 31, 1989, 7.2 percent of risk-weighted assets as of December 31, 1990, and 8.0 percent of risk weighted assets as of December 31, 1992. FIRREA limited the amount of regulatory goodwill that could be utilized by an institution in meeting core and risk-based capital requirements. The amount of qualifying supervisory goodwill permitted to be utilized in the calculation of core and risk-based capital was limited initially to 1.5 percent of total assets. The limit declined gradually each year and was phased out entirely by December 31, 1994.

On January 18, 1989, Heritage's board of directors adopted a plan converting Heritage from a mutual savings bank into a federal stock savings bank, and the concurrent formation of a holding company. Subsequently, Heritage Bankcorp, Inc. (the Heritage Holding Company) was incorporated under the laws of the State of Delaware on February 7, 1989, for the purposes of becoming a holding company of Heritage and acquiring, at the effective date of conversion, all capital stock in Heritage. Heritage completed its conversion to a federal stock savings bank on August 10, 1989. On that day, the Heritage Holding Company issued 2,139,000 shares of $.01 par value common stock at $10.25 per share. In addition, the Heritage Holding Company purchased one share of Heritage's common stock for $18,424,750.00, becoming Heritage's sole shareholder. On July 27, 1993, the Heritage Holding Company, Standard Federal and HFSB Acquisition Corporation, a wholly owned subsidiary of Standard Federal, executed an agreement and plan of reorganization. The agreement called for the merger of Heritage with and into Standard Federal, and the liquidation and dissolution of the Holding Company.

Specifically, under the agreement, HFSB Acquisition Corporation would merge with and into the Heritage Holding Company. The Heritage Holding Company would be the surviving corporation. Subsequently, Heritage Savings Bank would merge with and into Standard Federal. Following the merger between Heritage and Standard Federal, the Heritage Holding Company would be completely liquidated. Standard Federal Bank's acquisition of Heritage was completed on December 3, 1993.

From the time that FIRREA's new capital standards were implemented until its acquisition by Standard Federal in 1993, Heritage exceeded FIRREA's minimum capital standards and met FIRREA's "fully phased-in" minimum capital requirements. Apart from normal amortization and reduction for tax benefits, Heritage never wrote off any of the goodwill created from use of the purchase method to account for the acquisition of Family Federal until Heritage was acquired by Standard Federal.

## DISCUSSION

The defendant's motion for summary judgment was filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H.Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant

or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judg-

ment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.1997) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a

genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Since government liability in this case has been established, the remaining issue in dispute is whether Heritage was damaged in any compensable manner as a result of the enactment of FIRREA. In the instant case, the plaintiff has proposed three, alternative damages claims. First, the plaintiff requests "expectancy damages in the form of lost profits, measured by estimating the profits Heritage would have made utilizing the regulatory capital taken by defendant." Second, plaintiff also requests "expectancy damages in the form of the value of the capital taken by defendant, measured by estimating the replacement cost of that capital." Finally, plaintiff requests reliance damages, "measured by the costs incurred by Heritage under the contract that defendant breached."

The defendant's motion for summary judgment on the issue of damages argues that no material issues of fact are in dispute. According to the defendant, plaintiff has presented "legally deficient" damages claims, which have been rejected previously in other *Winstar*-related cases by the United States Court of Appeals for the Federal Circuit, and therefore, as a matter of law the plaintiff cannot succeed. In response, plaintiff contends that defendant has failed to establish that the methodologies employed by plain-

tiff's experts are legally invalid or precluded as a matter of law.

In the current case, after reviewing the plaintiff's expert damages reports, the court concluded that, to resolve defendant's summary judgment motion, it would be of assistance to the trier of fact for plaintiff's damages experts to more fully explain their expert findings and the reasoning and data on which the findings are based. If the defendant was correct that no possible damages theory had been presented which would allow recovery, a full-scale damages trial would not be necessary. Therefore, the court adopted a mini-hearing approach in which both of plaintiff's damages experts would be allowed to testify and defendant would have the opportunity to cross-examine. The testimony offered by plaintiff's experts has been helpful and allow the court to more fully understand plaintiff's damages theories and the basis on which each of plaintiff's experts reached his conclusions.

## I. Expectancy Damages

As the United States Court of Appeals for the Federal Circuit has explained, "[i]n the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance, and restitution." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed.Cir.2004) (citing Restatement (Second) of Contracts § 344 (1981)). The granting of expectancy damages is one method of " 'mak[ing] the non-breaching party whole' " because this remedy gives the non-breaching party " 'the benefits he expected to receive had the breach not occurred.' " *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed.Cir.2002) (quoting *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981))), *reh'g denied* (2002); *see also Hansen Bancorp, Inc. v. United States*, 367 F.3d at 1308 ("Compensation of a party's expectation interest 'attempts to put him in as good a position as he would have been in had the contract been performed, that is, had there been no

breach.' This is commonly referred to as giving the injured party the 'benefit of the bargain.' " (citations omitted)); *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920 (2002); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001), *reh'g denied* (2001). Those benefits " 'are often equated with lost profits, although they can include other damage elements as well.' " *Energy Capital Corp. v. United States*, 302 F.3d at 1324 (quoting *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d at 1380) (citing Restatement (Second) of Contracts § 347 (1981)); *see also Hansen Bancorp. Inc. v. United States*, 367 F.3d at 1308 ("An award of lost profits is one way of compensating the promisee's, or the non-breaching party's, expectation interest."); *see also LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir.2003) ("The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach."), *reh'g denied* (2003); *Cal. Fed. Bank v. United States*, 245 F.3d at 1349.

### A. Lost Profits

Recently, the United States Court of Appeals for the Federal Circuit has provided additional guidance for reviewing expectancy damages claims based on lost profits in the *Winstar* context:

Expectancy damages theory, based on lost profits, has proven itself impractical for these cases, and generally not susceptible to reasonable proof. We have not, however, barred as a matter of law the use of expectancy/lost profits theory, *see Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001), but, given the speculative nature of such a damages claim, one that has yet to be successfully established in any *Winstar* case,[3] *see, e.g., Cal. Fed. Bank v. United States*, 54 Fed. Cl. 704 (2002) (remand), experience suggests that it is largely a waste of time and effort to attempt to prove such damages.

**3.** *See*, however, *Commercial Fed. Bank v. United States, 59 Fed.Cl. 338, 345–46 (2004).*

*Glendale Fed. Bank, FSB, v. United States,* 378 F.3d 1308, 1313 (Fed.Cir.2004). With this guidance, this court evaluates plaintiff's expectancy damages model premised on lost profits as a matter of law.

■ The Federal Circuit has delineated the following standard, which must be met by a plaintiff to recover lost profits for breach of contract:

[T]he plaintiff must establish by a preponderance of the evidence that: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*Energy Capital Corp. v. United States,* 302 F.3d at 1325 (citations omitted); *Cal. Fed. Bank v. United States,* 245 F.3d at 1349 ("Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.'" (quoting *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961))); *Columbia First Bank, FSB v. United States,* 60 Fed.Cl. 97, 101 (2004) (quoting *Commercial Fed. Bank, FSB v. United States,* 59 Fed.Cl. at 344).

Without conceding the first two prongs of the lost profits test identified by the Federal Circuit, the defendant argues that this case can be disposed of on the issue of whether "a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." *Energy Capital Corp. v. United States,* 302 F.3d at 1325. The mini-hearing, and the filings submitted by both parties in support of that mini-hearing, addressed only the issue of whether lost profits can be estimated with reasonable certainty as a matter of law.

"Plaintiff has the burden to prove expectancy damages [including lost profits] with 'reasonable certainty.' A damages claim may not be based on mere speculation. Never-

theless, 'if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery ....'" *Commercial Fed. Bank v. United States,* 59 Fed.Cl. at 350–351 (citations omitted). In evaluating the "reasonable certainty" prong, the court in *Columbia First Bank* recently stated:

Precedential authority as to the amount of uncertainty or imprecision that is acceptable under the "reasonable certainty" standard for estimating damages is not extensive. *See, e.g., Chain Belt [Co. v. U.S.],* 127 Ct.Cl. at 59[, 115 F.Supp. 701 (1953)] ("The more recent [circa 1953] and general view of the courts seems to be that if the fact of damage, that is, lost profits, is certain, uncertainty as to the precise amount lost is not necessarily fatal to recovery." (citation omitted)). The court, instead of testing a damages model for a particular level of a precision, tests the model for its " "sufficiency to enable a court or jury to make a fair and reasonable approximation." " *Bluebonnet,* 266 F.3d at 1355 (citations omitted).

\* \* \* \* \* \*

In this case, therefore, to meet the reasonable certainty standard plaintiff's damages model must ... be based on sufficient factual evidence, must use assumptions and calculations that are moored in that factual evidence, and must be credible .... Plaintiff's model must be reasonably certain in order to provide this court with the justification for an award that is "a fair and reasonable approximation" of plaintiff's lost profits damages. *See Bluebonnet,* 266 F.3d at 1355.

*Columbia First Bank, FSB v. United States,* 60 Fed.Cl. at 107–108; *see also Glendale Fed. Bank v. United States,* 378 F.3d at 1313 ("'[I]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the court's duty is to 'make a fair and reasonable approximation of damages.'" (quoting *Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d at 1356–57)).

■ In *California Federal Bank v. United States,* the Federal Circuit explained that an

award of lost profits is appropriate under the following circumstances:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

*Cal. Fed. Bank v. United States*, 245 F.3d at 1349 (quoting *Wells Fargo v. United States*, 88 F.3d 1012, 1022–23 (Fed.Cir.1996)).

Defendant argues that Heritage's lost profits claim is indistinguishable from the claim rejected in *Wells Fargo Bank v. United States* by the Federal Circuit. 88 F.3d at 1012.[4] In *Wells Fargo*, the Federal Circuit found that the alleged lost profits did not stem from the subject of the contract itself:

> In the present case, in contrast, the purpose of the guarantee was to enable Wells Fargo to make profits from the interest on its loan to High Plains, not on some other loans it might make. The only portion of the damages the Court of Federal Claims awarded that directly resulted from the failure to issue the guarantee was the $389,423 of the indebtedness that Wells Fargo wrote off—the award of which ... we uphold.

*Id.* at 1023.

The plaintiff maintains that the *Winstar* cases can be distinguished because:

Providing Heritage and other acquiring thrifts with regulatory capital to leverage into additional profits, however, was precisely the purpose of the goodwill contracts in this and the other *Winstar*-related cases, and the profits lost by the removal of that capital are precisely the profits that were anticipated to grow directly out of the contracts that were breached in these cases.

Indeed, in *Cal.Fed*, after quoting the above passage from *Wells Fargo*, the Federal Circuit distinguished between the goodwill contracts in *Winstar* cases and the contract in *Wells Fargo*:

> The subject of the contract between Cal Fed and the government was Cal Fed's assumption of the net liabilities of the acquired thrifts in exchange for the promised favorable regulatory treatment. The continued use of supervisory goodwill as regulatory capital for the entire 35–40 year amortization period initially promised was therefore a central focus of the contract and the subject of the government's breach. Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages.

*Cal. Fed. Bank v. United States*, 245 F.3d at 1349; *see also Columbia First Bank, FSB v. United States*, 60 Fed.Cl. at 102 ("The issue of whether investment profits, foregone as a result of the loss of regulatory capital, are, if proven, sufficiently related to the breaching provisions of FIRREA to be recoverable in *Winstar*-related cases has been adequately resolved in plaintiff's favor."); *Commercial Fed. Bank v. United States*, 59 Fed.Cl. at 345–46 ("While *Wells Fargo* provides the principle by which causation for lost profits is judged, *Cal.Fed*, is an important guide to its

---

4. In *Wells Fargo*, the Farmers Home Administration (FHA) entered into a contract to guarantee a loan made to a third party, provided certain conditions were met. *Id.* at 1016–17. The FHA subsequently refused to issue the guarantee. *Id.* at 1018–21. The Court of Federal Claims found that the refusal constituted a breach. *Id.* Wells Fargo contended that it incurred damages due to the breach when it was required to charge off the amount of the loan, which resulted in an equal reduction to its regulatory capital. *Id.* at 1022. The plaintiff bank sought to recover the profits it would have earned by leveraging the lost capital. *Id.* The Court of Federal Claims "awarded damages for the profits Wells Fargo allegedly would have made on the additional loans it could have made" had there been no breach. *Id.* at 1023. The Federal Circuit reversed the decision, stating that the loans were " 'too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.' " *Id.* (quoting *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353, 357–58 (1951)).

application in the *Winstar* context.... Although that profit was to be made on 'collateral undertakings,' such as mortgage loan activity, these profits were the result of the 'use of the subject of the contract itself.' The court holds that it is proper to consider alleged lost profits from the use of the promised supervisory goodwill as part of plaintiff's damages."); *LaSalle Talman Bank v. United States*, 45 Fed.Cl. 64, 88 (1999) ("Defendant has dramatically over-read the holding of *Wells Fargo*. The court in *Glendale* has addressed this precise issue and points out that *Wells Fargo* stands for the unremarkable proposition that gains which do not flow proximately out of the undertaking of the contract itself are too speculative. Here, unlike *Wells Fargo*, the claimed lost profits are asserted to arise from the very subject of the breached portion of the contract the lost supervisory goodwill. Although the types of damages sought in *Wells Fargo* may be comparable to those sought here, the difference is that in that case there was no direct connection between the alleged damages and the government's obligation, which was merely to provide a loan guarantee." (citation omitted)), *aff'd in part, vacated in part*, 317 F.3d 1363 (Fed.Cir.2003); *Glendale Fed. Bank v. United States*, 43 Fed.Cl. 390, 398 (1999) ("Critical to the inquiry, then, is what the purpose of the contract is. Although, as it happens, Wells Fargo and Glendale happened to use the same expert, who happened to put forward a lost profits theory based on lost leverage, the contracts, and their purposes are very different. The question is not whether the profits are to be derived from undertakings with third parties, but what the subject and purpose of the contract is."), *aff'd in part, vacated in part, and remanded*, 239 F.3d 1374 (Fed.Cir.2001). Indeed, while the Federal Circuit recently cast doubt on whether expectancy damages theories based on lost profits can be proven, in the *Winstar* context, the Federal Circuit also stated that "[w]e have not, however, barred as a matter of law the use of expectancy/lost profits theory...." *Glendale Fed. Bank v. United States*, 378 F.3d at 1313 (citing *Cal. Fed. Bank v. United States*, 245 F.3d at 1350).

Plaintiff's lost profits claim, therefore, merely survives the first threshold question,

as articulated by the Federal Circuit, which is: do the alleged lost profits stem from the contract itself or do they derive "from other independent and collateral undertakings"? *Wells Fargo Bank v. United States*, 88 F.3d at 1023. While the courts have found in the *Winstar* context that the loss of supervisory goodwill can cause a reduction in investments and related profits resulting in the possibility of lost profits damages, the Federal Circuit has also stated that, "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits—on establishing what might have been—are well recognized." *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d at 1380; *see also Columbia First Bank, FSB v. United States*, 60 Fed.Cl. at 102.

*Plaintiff's Lost Profits Model*

■ According to plaintiff's expert, S. Lynn Stokes, his model attempts to estimate Heritage's damages for lost profits, and is "an income forecast approach to expectancy damages." Based on his review, Mr. Stokes claims that Heritage is entitled to $52 million in damages for lost profits, "measured by estimating the profits Heritage would have made utilizing the regulatory capital taken by defendant," as a result of the enactment of FIRREA. Mr. Stokes then "grossed up" the lost profits damages of $52 million by $39.1 million, allegedly to compensate Heritage for paying future taxes on a potential lost profits damage award, resulting in a lost profits claim of $91 million.

Thrifts generate profit by leveraging capital to support the growth of assets. In other words, thrifts employ capital "to attract low-interest deposits," which, in turn, "support higher-yielding loan assets." As a result, thrifts yield "a net positive spread, or net interest margin" between the low-interest deposits and the higher-yielding loan assets. Indeed, one of the assumptions in Mr. Stokes' model is that on average, the yield curve would be positively sloped over the 22 year period of his forecast. In other words, according to the plaintiff, long-term rates would be higher than short-term rates on average over the forecast period, which "is a fundamental assumption that drives the prof-

itability of depository institutions, especially thrifts."

The basic premise of Mr. Stokes' model is that, absent the breach of contract in this case, Heritage would have possessed a certain amount of capital in the form of goodwill. Mr. Stokes' model "estimates the additional profits Heritage would have earned over the remaining life of the goodwill contract on the incremental assets the lost supervisory goodwill capital would have supported if the government had not breached the contract." At the hearing, Mr. Stokes explained that, of the original $36.9 million of goodwill, $24.6 million is the amount that remained unamortized as of the date of the breach. Mr. Stokes' model presumes that, as of the date of the breach, the entire amount of goodwill was eliminated from Heritage's capital immediately.[5] Therefore, in his model, $24.6 million is the amount of goodwill allegedly eliminated following the breach.

The amount of goodwill that remained unamortized at the date of the breach would have decreased in each of the remaining 22 years according to the 25–year straight-line, contract amortization schedule. Mr. Stokes, therefore, began his model by calculating the average, unamortized goodwill for each of the twenty-two years of his calculation.

As defendant notes, Mr. Stokes' model assumes that, absent the breach, Heritage would have fully leveraged the entire amount of its goodwill, that is, it would have "fully utilize[d] its available non-breach capital" to acquire additional assets. The amount of additional assets that this goodwill capital would support, "or into which it could be leveraged," is determined by the "capital-to-asset leverage ratio" Heritage would have

employed in the " 'but-for' world."[6] During the hearing, Mr. Stokes explained that the "leverage ratio is the capital of the institution divided by the total assets in the post-FIRREA period." Based on documentary evidence he allegedly examined and his interpretation of the policy employed by Heritage's senior management, Mr. Stokes concluded that the appropriate capital leverage ratio to apply in his model was 6 percent.[7]

By utilizing a 6 percent capital requirement/leverage ratio, Mr. Stokes leveraged the goodwill for a period of 22 years, enabling Heritage to acquire assets in addition to those held by the actual thrift. With the application of a 6 percent capital leverage ratio, each dollar of lost goodwill would have enabled Heritage to add $16 in additional assets to its balance sheet. Therefore, to calculate the amount of assets that each dollar of goodwill would support, Mr. Stokes multiplied the unamortized goodwill by 16. Mr. Stokes applied the capital ratio of six percent to the original amount of goodwill capital ($24 or $26 million) to generate approximately $450 million in additional assets.

Mr. Stokes also assumed that Heritage would have continued to maintain the same "product mix," or types and kinds of assets and liabilities, in the "but-for world" that it had maintained in the actual world before and after the breach. According to Mr. Stokes, this assumption would result in the same net interest margin. Mr. Stokes testified that Heritage could be characterized as a "garden variety thrift;" it had consistently invested about 75–80 percent of its assets in mortgage or mortgage-related products and the majority of its liabilities was in the form

---

5. Defendant contests this point, claiming that FIRREA allowed thrifts to continue to count a declining portion of their goodwill as regulatory capital through December 31, 1994.

6. Mr. Stokes explained in his testimony that the "but-for world" is "the assumption that FIRREA and [its] regulations would have looked precisely as they looked in the real world, except that the breaching provision of FIRREA, the one that eliminated Heritage's goodwill capital," would not exist. In other words, "everything would have been the same as it was except that the goodwill capital would have remained available."

7. Heritage met and exceeded FIRREA's fully phased-in capital requirements at all times after the breach. The model's use of a capital requirement/leverage ratio of 6 percent is based on Mr. Stokes' opinion that Heritage's management believed that it was required to maintain 6 percent "tangible" capital in order to pursue acquisitions of other financial institutions. As defendant underscores and Mr. Stokes concedes, the 6 percent ratio used in the model does not stem from FIRREA, nor from any capital regulations after FIRREA.

of Federal Home Loan Bank advances or customer deposits. Mr. Stokes outlined Heritage's alternative asset growth strategies, or the alternative sources of funds available to Heritage with which to leverage its goodwill, including acquisitions of other thrifts in Heritage's market area, internal deposit growth, FHLB advances,[8] wholesale deposit purchases,[9] and mortgage servicing rights purchases.[10] According to Mr. Stokes, Heritage's "preferred method of growth" was through acquisition because this strategy added to the thrift's long-term franchise value.

The anticipated earnings from these additional assets were then projected by multiplying the amount of additional assets by a rate of return on average assets (ROAA)[11] that Mr. Stokes determined to be reasonable based upon Heritage's actual performance prior to the breach. Specifically, Mr. Stokes concluded that Heritage's actual average return on assets (0.716 percent) during the three fiscal years 1987 through 1989, following Heritage's acquisition of Family Federal and before the breach impacted Heritage's earnings was reasonable to use in forecasting Heritage's future earnings on additional assets. Mr. Stokes' model, therefore, employs the 0.716 percent return on average assets, or ROAA, for every year of his 22–year model.[12]

The income generated from the additional assets was then adjusted for goodwill amortization. The model then discounted the resulting lost profits to the date of trial. Mr. Stokes' model yields approximately $11.1 million in total "goodwill lost profits" for the 22–year period covered by the model. Mr. Stokes then calculated "reinvestment lost profits," or the profits Heritage would have allegedly earned by leveraging its goodwill lost profits. The reinvestment of lost profits also is calculated by using the same 6 percent capital requirement/leverage ratio and the 0.716 percent ROAA. In sum, approximately $41 million of the total $52 million in lost profits estimated by Mr. Stokes' model stems from the reinvestment of the original $11.1 million in goodwill lost profits.[13] In short, the basic equation used by Mr. Stokes to calculate lost profits is: (capital lost or goodwill) $\div$ (leverage ratio) $\times$ ROAA $=$ lost profits.

Finally, to make plaintiff whole, Mr. Stokes "grossed up" the discounted amount to reflect the fact that his income forecast is "an after-tax calculation" because the annual earnings were calculated each year using Heritage's after-tax ROAA.[14] Mr. Stokes therefore "grossed up" the lost profits damages of $52 million by $39.1 million to compensate Heritage for paying taxes on a potential lost profits damages award resulting in a total lost plaintiff's claim of $91 million.

8.  As Mr. Stokes explained in his testimony:
    Federal Home Loan Bank advances are basically your ability to borrow from the Federal Home Loan Bank system on an advance basis. In other words, instead of going out and attracting money from depositors, sometimes for a variety of strategic reasons it is more appealing to go out and get the money from the Federal Home Loan Bank. And it is essentially one of the things that the Federal Home Loan Bank system is designed to do is improve the liquidity of, originally of thrifts but now of all kinds of deposit institutions...."
    FHLB advances allowed thrifts to borrow money from their regional Federal Home Loan Banks at competitive interest rates for a variety of maturities. The advances were supported by a thrift's general pledge to the FHLB of mortgages, mortgage-backed securities, and other marketable securities.

9.  Mr. Stokes explained that wholesale deposit purchases are another means through which a thrift could attain cash to invest in assets. Mr. Stokes stated that: "You do a deal with a broker-

age firm to sell your CDs to their customers and they earn a fee for doing that."

10. Mortgage servicing rights are the right to service other institutions' mortgages for a fee. Purchased mortgage servicing rights are "the right to service somebody else's loan."

11. A thrift's "ROAA" is calculated by dividing its after-tax net income by total average assets at the end of the year.

12. For purposes of its summary judgment motion, the defendant does not contest the accuracy of the model's 0.716 percent actual return.

13. The defendant argues that the reinvestment lost profits are prohibited pre-judgment interest.

14. Mr. Stokes observed that the same computation could have been performed without a tax gross-up by using a pre-tax ROAA, which would have the same ultimate total.

In its motion for summary judgment, the defendant contends that plaintiff cannot prove damages for lost profits with reasonable certainty. Specifically, defendant asserts that plaintiff's lost profits claim is legally deficient, arguing that it is "a purely theoretical exercise." The defendant challenges the basic, underlying assumption of plaintiff's lost profits model, that "if it had more capital, it would have been larger and remain equally as profitable," and contends that this assumption "cannot withstand the requirement that damages be proved with reasonable certainty." According to the defendant, Mr. Stokes' "mere assumption" that lost leverage can be translated into lost profits, despite his inability "to identify any specific assets and liabilities that Heritage would have acquired absent the breach, renders his lost profits methodology unduly speculative." Defendant argues that this court and the Federal Circuit have rejected lost profits methodologies materially indistinguishable from that utilized by Mr. Stokes, "which assert that, absent the breach, a financial institution would have been larger and more profitable, assuming merely that the mix of 'but-for' assets and liabilities acquired would have been fundamentally the same as those of the actual bank."

Plaintiff argues that additional evidence "as to the types of assets Heritage would likely have acquired, along with other evidence establishing that there would in fact *have been* a profit" should be presented at a trial and that summary judgment should be denied. (emphasis in original). Plaintiff further argues that defendant misunderstands the reasonable certainty standard, which it maintains requires only that a plaintiff seeking lost profits establish the fact of profits with reasonable certainty, as opposed to the amount. Plaintiff asserts that the defendant has failed to address Mr. Stokes' testimony that Heritage would, in twenty-two years, have earned some profit from leveraging some portion of the lost goodwill capital. Instead, according to the plaintiff, defendant attacks Mr. Stokes' estimate of the amount of that profit, "which not only may be uncertain, but by its very nature as a prediction of future profits that were never made will virtually always be uncertain and hypothetical."

(citation omitted). Plaintiff criticizes defendant's argument, stating that "even if Mr. Stokes's income forecast were subject to a reasonable certainty standard, the notion that it can satisfy that standard only to the extent that it identifies the specific assets Heritage would have acquired is absolute nonsense."

In *Cal.Fed*, the Federal Circuit addressed a lost profits damages claim in the *Winstar* context and stated:

> Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute. R. Ct. Fed. Cl. 56(c). Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits.

*Cal. Fed. Bank v. United States*, 245 F.3d at 1350; *see also Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223, 233–34 (2003) ("[The] Court of Federal Claims has struggled with the appropriateness of granting motions for summary judgment with regard to expectancy damages claims."). In several cases, judges of this court, citing the above excerpt from the Federal Circuit's decision in *Cal.Fed*, have rejected the use of summary judgment with respect to damages claims for lost profits, because the records in those cases indicated that material facts were in dispute. *See Long Island Sav. Bank, FSB v. United States*, 60 Fed.Cl. 80, 92–93 (2004); *Globe Sav. Bank, F.S.B. v. United States*, 59 Fed.Cl. 86, 96 (2003); *Anchor Sav. Bank, FSB v. United States*, 59 Fed.Cl. 126, 143 (2003); *Citizens Fin. Servs., FSB v. United States*, 57 Fed.Cl. 64, 73 (2003); *Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108, 134 (2003); *Columbia First Bank, FSB v. United States*, 54 Fed.Cl. 693, 702 (2002); *Citizens Fed. Bank, FSB v. United States*, 52 Fed.Cl. 561, 563 (2002).

Despite a number of trials, "[t]here has only been one *Winstar*-related case to date [*Commercial Federal Bank v. United States*] where the leverage model has been found to prove lost profits damages." *Columbia First Bank, FSB v. United States*, 60 Fed.Cl. at

118 (citing *Commercial Fed. Bank v. United States,* 59 Fed.Cl. at 344). In the majority of the other cases, after lengthy trials on damages, the judges rejected *Winstar* plaintiffs' lost profits models. *See Columbia First Bank, FSB v. United States,* 60 Fed.Cl. at 125 ("Because plaintiff failed to adduce sufficient evidence to estimate lost profits damages with reasonable certainty, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages."); *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 57 Fed.Cl. 598, 622, 627 (2003); *Suess v. United States,* 52 Fed.Cl. 221, 228 (2002); *Bank United of Tex. FSB v. United States,* 50 Fed.Cl. 645, 645 (2001), *aff'd in part, rev'd in part,* 80 Fed.Appx. 663 (Fed.Cir.2003). Indeed, based on this history, the Federal Circuit recently stated:

> Expectancy damages theory, based on lost profits, has proven itself impractical for these cases, and generally not susceptible to reasonable proof.... [G]iven the speculative nature of such a damages claim, one that has yet to be successfully established in any *Winstar* case, experience suggests that it is largely a waste of time and effort to attempt to prove such damages.

*Glendale Fed. Bank v. United States,* 378 F.3d at 1313 (citations omitted).

Even before this more recent guidance from the Federal Circuit, in two cases, *Fifth Third Bank of Western Ohio v. United States,* and *Southern National Corporation v. United States,* judges of this court have granted defendant's motions for summary judgment on *Winstar* plaintiffs' claims for lost profits. *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 242; *S. Nat'l Corp. v. United States,* 57 Fed.Cl. 294, 307 (2003). In both cases, the lost profits models were similar, if not identical, to the lost prof-

its model employed by Mr. Stokes in this case. *See S. Nat'l Corp. v. United States,* 57 Fed.Cl. at 303–304; *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 228. In *Fifth Third,* the court acknowledged that, after *Cal.Fed,* "it would be the *rara avis,* indeed, that could merit summary judgment." *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 236. However, the *Fifth Third* court interpreted *Cal.Fed's* holding "as [merely] reinforcing established jurisprudence on summary judgment," as opposed to "stating a rule applicable to all *Winstar* cases" that would preclude the use of summary judgment in a damages claim for lost profits. *Id.*

The lost profits model employed in *Fifth Third* is similar to the model Mr. Stokes used in case currently before the court.[15] The lost profits model in *Fifth Third* predicts that, if the bank, Citizens, could have leveraged supervisory goodwill as an asset, it would have become a larger institution. *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 228. The model in *Fifth Third* also calculates returns based on Citizens' actual performance, "assuming that the mix of the But for Bank's assets and liabilities would have been fundamentally the same as that of the actual bank." *Id.* at 238. In sum, like the Stokes model, the methodology in *Fifth Third* "assumes that Citizens would have grown and profited with the adjusted asset base fully levered by the restoration of goodwill in the same manner as Citizens grew in the real world with its reduced asset base." *Id.* at 240.

In addition to finding that "[p]laintiff's model fails to account for any real-world events other than the profitability of Citizens during the 1990's before its purchase by plaintiff," the *Fifth Third* court found "the

---

**15.** The model employed in *Fifth Third* to calculate lost profits is explained in the following manner:

> To calculate lost profits, Dr. Brumbaugh first hypothesizes a "But-for Bank," which is the bank that would have existed absent FIRREA, with supervisory goodwill counted towards the But-for Bank's regulatory capital and with the Cincinnati division restored to it. Dr. Brumbaugh assumes, for his model, that the core capital ratio for the But-for Bank was the same as that of the actual bank. Dr. Brumbaugh

then calculates lost profits by projecting the return of those missing incremental assets that the But-for Bank would have earned. The projections are based on, but are lower than, Citizens' actual performance during the period between the breach and 1998, when Citizens was taken over by plaintiff. Dr. Brumbaugh's model calculates lost profits as the product of the incremental assets and the incremental return that the But-for Bank would have earned. *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 228 (citations omitted).

most outstanding flaw" in the model to be the "assumption that the But–for–Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged." *Id.* at 241. The *Fifth Third* court noted that the model

> does not identify any business opportunities that Citizens would have pursued, or the markets that it would exploit as a But-for Bank, or the allocation of assets in any particular type of investment. The entire claim for lost profits assumes that a But-for Bank, with its adjusted asset base, would mimic Citizens' own experience in the post-FIRREA real world.

*Id.* at 240–41. The *Fifth Third* court found that this deficiency rendered plaintiff's model speculative as a matter of fact and law. *Id.* at 241.

The *Fifth Third* court distinguished *Cal. Fed* by highlighting the " 'considerable evidence' " presented in *Cal.Fed* that " 'more than sufficed' " to warrant trial. *Id.* at 241.

> The bank had submitted documentary evidence that it sold assets in the wake of the breach. It also submitted business plans and OTS documents purporting to show its intent to invest in certain assets. It provided specific documentation of single-family adjustable rate mortgages that it was forced to sell due to FIRREA. The bank traced the post-sale performance of those mortgages to show that they ultimately would have been profitable. The bank also submitted evidence to show that it was forced to sell a profitable business unit to meet capital requirements. The bank offered evidence of its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets it allegedly had to sell to remain in capital compliance.

*Id.* The *Fifth Third* court wrote that the Federal Circuit:

> did not state or imply that these types of evidence were exhaustive …however, defendant is correct that the appeals court

did not state or imply that the proffer of expert reports and voluminous documentation defeats summary judgment. Although the recitals of evidence in *Cal[.]Fed* did not establish a list of facts that must be present to survive summary judgment, they did reflect the nature and quality of evidence that the Federal Circuit ruled sufficient to withstand a summary judgment motion.

*Id.*

The *Fifth Third* court further stated that:

> the court rejects as a matter of fact and law the notion that a bank's expanded asset base would realize profits at a similar rate to that of its actual profits, absent an offer of evidence to show how the bank would have invested the augmented assets. Plaintiff in the case at bar merely asserts that the But-for Bank would have replicated everything Citizens did in the real world during the relevant period. This showing is insufficient to defeat defendant's motion for summary judgment.

*Id.*

The court also granted defendant's motion for summary judgment on a lost profits damages claims in *Southern National Corporation v. United States*, 57 Fed.Cl. at 306. In that case, Mr. Stokes also was the plaintiff's expert, and provided a model for estimating damages on lost profits. That model is identical to the one Mr. Stokes employed before this court. *Id.* at 303–304. For example, in *Southern National*, Mr. Stokes stated that his model " 'assumes that the assets obtained at the margin would mirror the asset composition of First Federal taken as a whole.' " *Id.* at 305. The *Southern National* court stated that, "[a]s in *Fifth Third*, plaintiffs have projected lost profits using past experience as a predictor of future performance, as opposed to a model reflecting categories of activities, opportunities, or lines of businesses that the thrift would have undertaken in the but-for world." *Id.* Therefore, the *Southern National* court concluded that Mr. Stokes' model suffers from the same weaknesses as the model in *Fifth Third*:

> Mr. Stokes assumed that First Federal would leverage goodwill in a manner that

would mimic its historical performance and that the return on the assets acquired would parallel the thrift's past earnings. Ultimately, Mr. Stokes' model is speculative and does not conform with the parameters governing the grant of expectancy damages.

*Id.*

Mr. Stokes' lost profits damages model in the case currently before this court exhibits the same flaws as the models in *Fifth Third* and *Southern National Corporation.* Mr. Stokes' model predicts that absent the breach, Heritage would have been larger and more profitable, assuming merely that the mix of "but-for" assets and liabilities acquired would have been fundamentally the same as those of the actual bank. As Mr. Stokes, himself, testified: "They were going to continue to keep doing basically the business they had always done. It was just going to be bigger." Indeed, Mr. Stokes assumes that, on July 1, 1989, the date upon which Mr. Stokes' model commences, Heritage would have acquired $468 million in additional assets.

As the defendant argues, however, the "opportunity to grow by leveraging a thrift's capital has neither an immediate nor assured value." *See United States v. Winstar,* 518 U.S. at 850–51, 116 S.Ct. 2432 ("the treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it *hoped,* make more profits)"(emphasis added)); *Glendale Fed. Bank v. United States,* 239 F.3d at 1382 (leverage has the potential for loss); *Bank United of Tex. FSB v. United States,* 50 Fed.Cl. at 654.

As judges of this court previously have found in the *Winstar* context, a reduction in a thrift's leverage capacity does not immediately and directly result in lost profits. *Bank United of Tex. FSB v. United States,* 50 Fed.Cl. at 654 (a "reduction in borrowing capacity, standing alone, did not result in immediate economic harm."). Rather, the "value of leverage is in the *potential* for profits." *Id.* at 655, n. 11 (emphasis in original). The court in *Bank United of Texas* further stated that "[e]ven under plaintiffs'

theory and models, no profits could have been lost unless and until Bank United would have—but was unable to as a result of lost leverage capacity—actually used the leverage capacity by borrowing, reinvesting and achieving a positive rate spread." *Id.* at 655. Therefore, as defendant maintains, "the value of any leverage is ultimately dependant upon the identification of specific, profitable opportunities through which one can effectively deploy one's capital."

At the hearing, Mr. Stokes appeared to agree with this fundamental proposition upon cross-examination:

Q. If a thrift did not leverage goodwill then it could not increase its profits, correct?

A. That's true.

Q. So you would agree with the general proposition that the value of leverage is the potential for profits?

A. Well, that's like the value of all capital. If you don't employ your capital effectively, then your company is less profitable.

Q. You would also agree with the general proposition then that the leverage also has the potential for loss?

A. There is always that possibility, yes.

Q. So you would expect goodwill would only be leveraged if profitable opportunities existed?

A. That's correct. And in a period where you had a positive yield curve and return on assets, then it would be inversely profitable.

Q. So the value of any leverage lost is really dependent on the existence of profitable opportunities?

A. That's correct.

In another exchange, Mr. Stokes also appeared to agree:

Q. Wouldn't you agree that leverage has the potential for profits, correct?

A. Yes.

Q. And we also agree it has the potential for loss, correct?

A. That's true.

Q. So adding leverage doesn't necessarily increase the value of the thrift, does it?

A. As a general proposition, I suppose that's true.

Q. In fact, as you stated, I believe, I think you will agree with the statement that the value of an entity is fundamentally the value of its assets and liabilities that it controls; is that correct?

A. Fundamentally, yes.

Mr. Stokes, therefore, conceded that, even if Heritage would have been bigger absent the breach, that fact, alone, does not indicate that it would have been more, or equally as, profitable. As defendant maintains, lost leverage does not necessarily automatically translate into lost profits. Indeed, the documentary evidence in this case suggests that Heritage, itself, did not believe that a larger bank would necessarily be more profitable, casting doubt on Mr. Stokes' model and his assumption that on July 1, 1989, the date upon which Mr. Stokes' model commences, Heritage would have acquired $468 million in additional assets. For instance, Heritage's August, 1987 Business Plan states: "However, a growth strategy must be carefully managed. To grow too fast can invite significant problems. This is clearly an area where success does not necessarily suggest more endeavors."

Mr. Stokes also appeared to agree with the proposition that future growth will not necessarily yield the same returns as the bank had experienced in the past, thereby contravening a fundamental assumption of his own model that the bank would experience the same rate of return as the bank had experienced in the past on the same product mix the bank had used in the past. "Q. [Defendant's counsel] So Heritage also recognized that just because you have been successful in the past, you can't just assume that future growth will lead to the same success, correct? A. [Mr. Stokes] Well, that's true."

The defendant argues that: "Absent an offer of evidence to show what assets Heritage would have specifically acquired, the notion that Mr. Stokes posits here, that Heritage's incremental assets would realize a similar rate of profits to that of its actual assets, must be rejected as a matter of law." As suggested, proof of but-for-the-breach investments and proof of the profitability of fore-gone investments are essential elements of lost profits damages in the *Winstar* context. *See Columbia First Bank, FSB v. United States,* 60 Fed.Cl. at 125 ("Because plaintiff has not proved that Columbia would have invested more in the but-for world, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.... Because plaintiff has not proved that its alleged incremental assets portfolio would have been profitable, the court concludes as a matter of law that plaintiff is not entitled to lost profits damages.").

Based on the *Fifth Third* court decision, defendant contends that Mr. Stokes' model fails to identify the specific assets and liabilities that Heritage would have acquired through acquisition, or otherwise, absent the breach:

Mr. Stokes does not, and cannot, identify any specific profitable growth opportunity that Heritage was deprived of as a result of the breach. Nor did Mr. Stokes, for purposes of rendering his opinion, undertake any analysis to determine if any growth strategies in his "but-for" world would have actually proven to be profitable.

Plaintiff argues that the *Fifth Third* court's finding that the plaintiff in that case failed to identify specific investments or opportunities is unclear. In addition, plaintiff responds that:

Mr. Stokes identified acquisitions, FHLB advances, internal deposit growth, purchases of wholesale deposits and mortgage servicing rights as likely opportunities for Heritage's growth, Michigan and Ohio as the principal markets it would exploit, and mortgages and mortgage-backed securities as the type of investment from which Heritage would as a "garden variety" thrift, continue to earn a positive spread.

Plaintiff concludes that, "[a]ssuming this to be the degree of specificity the court found lacking in *Fifth Third*," the case before this court can be distinguished.

Mr. Stokes' model is based on the assumption that Heritage would have had the same product mix it had before the breach. The model assumes that Heritage would grow via

acquisitions, FHLB advances, mortgage-backed securities, purchases of wholesale deposits and mortgage servicing rights, and mortgage-backed securities. However, defendant is correct that Mr. Stokes does not identify any specific profitable growth opportunities, "[n]or does his methodology analyze whether any growth strategies in the 'but-for' world would have actually proven profitable." Indeed, the cross-examination of Mr. Stokes at the hearing reveals that the particular assets that Heritage would have acquired absent the breach are irrelevant to plaintiff's lost profits analysis. For instance, Mr. Stokes testified: "Q. But your model is not predicated on the acquisition of any particular company or assets; is that correct? A. That's correct."

With regard to Heritage's growth in the "but-for world," Mr. Stokes was the most specific when discussing acquisitions, which he claimed was Heritage's "preferred method of growth." He stated: "In fact, Heritage actively pursued a number of acquisitions including at least one, which reached the definitive agreement stage." Here, Mr. Stokes was apparently referring to a transaction that Heritage almost entered into with Security Savings Bank. However, Mr. Stokes also conceded that he did not study that potential acquisition, nor any acquisitions, for that matter, when constructing his model.

Q. . . . What documents did you look at to conclude that Heritage would have—the Security acquisition would have been a profitable opportunity for Heritage?

A. None.

\*　　\*　　\*　　\*　　\*　　\*

Q. And Security [Savings Bank], I think in your view, is one of the thrifts that Heritage could have acquired; is that correct?

A. That's correct.

Q. But again it is not relevant to your model who they would have actually acquired; is that correct?

A. That's correct.

\*　　\*　　\*　　\*　　\*　　\*

Q. Okay. And I think we also talked about, you didn't study whether Heritage could have acquired any of the thrifts in the but-for world; is that correct?

A. That's correct.

Q. And that would apply to [S]ecurity as well; is that correct?

A. That's correct. They did reach definitive agreement, though.

Q. For purposes of preparing your report and your opinion, did you do any analysis to determine whether or not an acquisition of Security would, in fact, have been profitable for Heritage?

A. Well, I think we covered that ground the other day. And I told you that I didn't believe that was necessary.

In sum, Mr. Stokes conceded that he did not study Heritage's possible growth via specific acquisitions: "Q. You didn't study any particular thrift acquisitions, correct? A. That's correct."

Moreover, in his report, Mr. Stokes stated that "the regional banking compact, which included Michigan, would have allowed Heritage to also pursue acquisitions in Indiana and Ohio. In sum, there was no shortage of opportunities available to Heritage which would have allowed it to grow through acquisition." However, Mr. Stokes' testimony reveals that he did not actually study any of these possible acquisitions, how likely such acquisitions were, whether or not they would have been profitable, or whether the potential acquirees would have the same asset and liability composition as Heritage, as his model assumes.

Q. Did you study how many thrifts for purposes of your report and opinion, how many thrifts in Michigan, say, had a balance sheet composition just like Heritage's?

A. It is one of those where I relied on my general experience. I did not go out and perform a separate study for that purpose.

Q. Did you study whether any of the thrifts that Heritage would have acquired in the but-for world would have indeed been profitable for Heritage? And this is for purposes of your report and opinion.

A. No.

Q. As we said it is not relevant to your analysis who they would have actually ac-

quired absent the breach; isn't that correct?

A. That's correct....

Q. Step back. I believe you said that you haven't done any analysis about how many thrifts in, say, Michigan had asset and liability compositions just like Heritage. Did you do any analysis of those thrifts that might be in Indiana?

A. No.

Q. Or Ohio?

A. No.

Q. So you can't say whether any of those thrifts in the but-for world would have had an asset and liability composition just like Heritage's at that time of the acquisition, can you?

A. No ...

\* \* \* \* \* \*

Q. But you didn't do any analysis of what thrifts in any of those states had an asset and liability composition just like Heritage's, did you?

A. I didn't do so because I didn't think it was necessary.

\* \* \* \* \* \*

Q. So you are basing your entire opinion on the profitable opportunities that exist in this case on what you think Heritage undertook, analysis Heritage undertook in pursuing acquisitions?

A. They did one acquisition that was successful. It was a large acquisition of a troubled company. They successfully turned that around. You pointed out their overall criteria for looking at companies, I think it is reasonable to believe, since they were good managers, that they would have looked at precisely those criteria and deciding who to acquire.

Q. You didn't do the analysis, did you, sir?

A. No, sir, I did not because I did not think it was necessary.

Q. So you can't say whether Heritage would have been profitable, or excuse me, that the additional assets and liabilities acquired by Heritage in the but-for world would have been profitable after the acquisition, can you?

A. If Heritage followed the scripture that you read to me from the various and sundry business plans, then they would have only made the acquisition if it was profitable. And if they made the acquisition, it therefore would have been profitable.

Q. But you didn't study how many profitable thrift acquisitions there were in Michigan, did you?

A. I didn't because I didn't think it necessary.

Q. You didn't study any financial statements for any of the but-for thrift acquisitions, did you?

A. I didn't because I didn't think it was necessary.

Q. You didn't study any financial statements for any of the but-for thrift acquisitions, did you?

A. I didn't because I didn't think it was necessary.

Q. Nothing that showed the thrifts['] asset and liability composition, did you?

A. Same answer. I didn't think it was necessary.

Q. Or the yields on their assets, did you?

A. I didn't think it was necessary.

Q. Or the cost of their liabilities?

A. I didn't think it was necessary.

\* \* \* \* \* \*

Q. Did you do any analysis, sir, of any potential acquisitions in the but-for world of thrifts that had a similar return on average assets as Heritage?

A. No, I didn't.

Q. Did you study how many branches any of these but-for thrifts had?

A. No.

Q. Did you look at their interest rate spread?

A. No.

\* \* \* \* \* \*

Q. You would agree, sir, wouldn't you, that the profitability of a thrift depends upon the composition of its assets and liabilities and the yields and costs associated with those assets and liabilities?

A. I don't dispute that.

Q. But you didn't study any of that, did you, other than assuming Heritage would acquire someone just like themselves.

A. That's correct.

Furthermore, despite indicating that acquisitions were Heritage's "preferred method of growth," Mr. Stokes did not even know if Heritage had any plans to pursue an acquisition: "Q. But you don't know if Heritage had any acquisition targets in mind just prior to FIRREA; is that correct? A. That's correct."

In addition, corporate documents do not demonstrate that Heritage planned to grow as much as Mr. Stokes projected, or at all, by acquisition. For instance, Mr. Stokes' model assumes that, as of the date of the breach, Heritage intended to grow by $468 million. However, the workpapers from the January, 1988 Federal Home Loan Bank examination of Heritage state: "Pres. Hayes indicated that the Bank is not pursuing any acquisitions at this time and would not do so until Family Federal is fully digested. However, he also indicated that the Bank would consider acquiring a shop, that was no larger than $200 million, in the future." In addition, the June 26, 1989 prospectus that Heritage Bankcorp issued with respect to Heritage Bank's conversion from mutual stock ownership indicates that as of that date, which is four or five days before Mr. Stokes' model starts, Heritage had no definitive plans to do an acquisition:

> The resulting holding company structure is expected to enable the Company through its subsidiaries [Heritage Bank], to expand the financial and other services currently offered by the Bank and its subsidiaries. As a holding company, the Company will have greater flexibility to diversify its business activities through existing or newly formed subsidiaries and through acquisitions. There are currently no definitive plans regarding such activities.

That same document goes on to state: "Through the acquisition of Family Federal in 1986, the Bank expanded its branch network in Michigan. The Bank's current strategy is to maintain its branch office network as opposed to rapid expansion into new market areas in Michigan." Also, in his deposi-

tion, Mr. Hayes testified that "Heritage did not consummate any acquisitions because 'there was no candidate presented that would make a good fit.'" In sum, while Mr. Stokes claims acquisition was Heritage's preferred method of growth, it does not appear that Heritage had any immediate acquisition plans, and if it did, the acquisition would have been for less than the $468 million projected by Mr. Stokes' model. As the court stated in *Columbia First Bank,* "[l]oss of leverage capacity for an investment that plaintiff has not shown it would have made absent the breach is not sufficient support for a lost profits damages claim." *Columbia First Bank. FSB v. United States,* 60 Fed.Cl. at 112 (citing *Bank United of Tex., FSB v. United States,* 50 Fed.Cl. at 655, 664).

Mr. Stokes' model also does not specifically identify any assets Heritage would have acquired, other than referring generally to FHLB advances, mortgage-backed securities, purchases of wholesale deposits and mortgage servicing rights, and mortgage-backed securities. For example, Mr. Stokes testified to the ability of Heritage to grow through internal deposit growth, but he admitted that this strategy was not discussed in his report and he did not specifically analyze internal deposit growth. Also, during the hearing, Mr. Stokes could not point to any documents to support his opinion that Heritage reduced the amount of FHLB advances post-FIRREA as a result of the breach.

Indeed, as defendant underscores, the fact that:

> no matter which strategy, or combination of strategies, Heritage undertook to grow the bank absent the breach, Heritage would have (Mr. Stokes claims) experienced lost profits of the exact same amount, given the purely mathematical function of Mr. Stokes's lost profits calculation... is the clearest indicator of the fundamentally speculative nature of Mr. Stokes's methodology.

The model Mr. Stokes' presents in the instant case is not grounded on the type of evidence identified as of sufficient quality in *Cal Fed:*

Cal Fed presented documentary evidence to show that it sold significant assets in the wake of the breach. Its business plans and Office of Thrift Supervision documents allegedly showed its intent to invest in low risk assets that it claims have proven profitable. It provided specific documentation of 24,664 single-family adjustable rate mortgages worth approximately $4 billion that it claims it was forced to sell to remain in capital compliance after the breach. Cal Fed then provided expert testimony, which traced the actual post-sale performance of these loans and arrived at lost profits of $317 million attributable to those sales. Additional documentary and deposition evidence was submitted to support Cal Fed's claim that in 1993 it was forced to sell a profitable business unit, California Thrift & Loan, to meet its capital requirements. It claimed the sale resulted in lost profits of $44 million. Cal Fed offered evidence of its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets that it allegedly had to sell to remain in capital compliance. *Cal. Fed. Bank v. United States,* 245 F.3d at 1349–50. As the *Fifth Third* court stated "[a]lthough the recitals of evidence in *Cal Fed* did not establish a list of facts that must be present to survive summary judgment, they did reflect the nature and quality of evidence that the Federal Circuit ruled sufficient to withstand a summary judgment motion." *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 241.

In short, Mr. Stokes' model presents the same deficiencies as the models in *Fifth Third* and *Southern National Corp.* Like those models, the flaw, here, is the "assumption that the But–for–Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged." *Id.* Indeed, in *Columbia First Bank, FSB v. United States,* the court recognized that "[o]ne of the potential pitfalls" of models such as Mr. Stokes' is that "this court has

rejected models that use more-of-the-same foregone assets projections without identifying specific types of investment opportunities." *Columbia First Bank v. United States,* 60 Fed.Cl. at 119–20 (citing *Southern National Corp. v. United States,* 57 Fed.Cl. at 306; *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 240). In *Columbia First Bank,* the court advised that the "obvious way to avoid such a pitfall is to submit evidence about the availability of typical investments, the history of the bank in pursuing those investments, and the capacity of the but-for bank to take advantage of those investments." *Id.* at 120. In support, the court cited *Commercial Federal Bank v. United States,* in which the "plaintiff offered credible evidence of the availability of investment opportunities, the history of investment practices, and the bank managers' ability to invest for growth …." *Id.* (citations omitted). In the case before this court, plaintiff's model, as evidenced by Mr. Stokes' testimony, is not based on such evidence.

The court "cannot presume proof of missing elements, to wit, what investments plaintiff would have made or activities in which it would have engaged in a hypothetical world without FIRREA and with its competitors restored to the real-world banking environment." *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 242. Like the court in *Fifth Third* and *Southern National Corp.,* this court rejects as a matter of law "the notion that a bank's expanded asset base would realize profits at a similar rate to that of its actual profits, absent an offer of evidence to show how the bank would have invested the augmented assets." *Id.* at 241. Like the plaintiffs in *Fifth Third* and *Southern National Corp.,* plaintiff "merely asserts that the But-for Bank would have replicated everything [Heritage] did in the real world during the relevant period. This showing is insufficient to defeat defendant's motion for summary judgment." *Id.*

The plaintiff also argues that the *Fifth Third* decision is erroneous and should not be followed because "no one could meet such a burden in estimating the future income of any business, and imposition of such a burden would effectively bar the recovery of lost

profits." Defendant responds by criticizing Heritage's assertion that to survive summary judgment, it need only offer Mr. Stokes' opinion that Heritage would have earned "some" profit absent the breach.

The Federal Circuit has stated that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party. 'If a reasonable probability of damage can be clearly established, uncertainty as to amount will not preclude recovery.'" *La-Salle Talman Bank, F.S.B. v. United States*, 317 F.3d at 1374 (quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)); *see also Glendale Fed. Bank v. United States*, 378 F.3d at 1313. However, as the *Fifth Third* court found, this precedent "that makes allowance for proof that is flawed merely as to the amount of damages does not displace the case law that requires proximity of cause and result. In *LaSalle* the Federal Circuit specifically noted that proximity, as contrasted with remoteness, is a critical factor in the damages analysis." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. at 242; *see also Columbia First Bank. FSB v. United States*, 60 Fed.Cl. 97, 106–07 (distinguishing *LaSalle Talman Bank, F.S.B. v. United States* by stating: "The discussion by the Federal Circuit [in *LaSalle Talman Bank, F.S.B. v. United States*] on which plaintiff relies was in the context of separating the profits associated with transactions in mitigation from breach-related lost profits. In that litigation, the breach-related damages had already been established at trial with reasonable certainty, with specific dollar figures attached to individual components of lost profits. The court believes that the burden of establishing damages with reasonable certainty in the first instance is distinguishable from and different than the burden of separating out mitigation-related profits from lost profits, the existence of which has already been proven to a reasonable certainty." (citations omitted)).

Additionally, in response to plaintiff's concern that "no one could meet the burden" delineated in *Fifth Third*, the *Fifth Third* court clarified that it is merely asking

> for some indication of how assets would be allocated *vis-a-vis* various business opportunities. Plaintiff cannot have it both ways: if it presumes that the But-for Bank would have approximated the same success in much the same measure as the real-world [Bank], it must take account of the business prospects that were available to the But-for [Bank] with its expanded asset base.

*Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. at 242. As the *Columbia First Bank* court stated, "this court does not reject out of hand ... the modeling of lost profits." *Columbia First Bank v. United States*, 60 Fed.Cl. at 123. However, as in *Columbia First Bank*, "the fundamental flaw of plaintiff's damages model is not that it uses but-for projections, but that these but-for projections are not rooted in and frequently conflict with the factual evidence presented to the court." *Id.* at 123–24.

In short, "[a] claimant must present sufficient evidence to prove that the amount of its lost profits was reasonably certain." *S. Nat'l Corp. v. United States*, 57 Fed.Cl. at 306 (citing *Energy Capital Corp. v. United States*, 302 F.3d at 1325). "The standard for reasonable certainty of damages in the *Winstar* context requires that the damages model and its estimates be 'grounded in the actual performance of the bank ....'" *Columbia First Bank v. United States*, 60 Fed.Cl. at 125; *see also Commercial Fed. Bank v. United States*, 59 Fed.Cl. at 351 ("Although plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion."). Since the specific assets that Heritage would have acquired absent the breach are irrelevant to plaintiff's lost profits analysis, Mr. Stokes' model is not based on sufficient facts to prove that the amount of plaintiff's lost profits was reasonably certain.

Plaintiff points to other cases, such as *Franklin Federal Savings Bank v. United States, Columbia First Bank v. United States,* and *Citizens Federal Bank v. United States,* in which the defendant's motion for summary judgment was denied based on *California Federal Bank v. United States,* 245 F.3d at 1350, which stated: "Both the existence of lost profits and their quantum are factual matters that should not be decided on

summary judgment if material facts are in dispute. R. Ct. Fed. Cl. 56(c).". This court, however, agrees with the *Fifth Third* court that this language merely "reinforc[es] established jurisprudence on summary judgment," as opposed to "stating a rule applicable to all *Winstar* cases." *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 236.

Moreover, in the cases in which defendant's motions for summary judgment on lost profits were rejected, the court had found disputed, material issues of fact in the record. *Long Island Sav. Bank, FSB v. United States,* 60 Fed.Cl. at 92–93; *Globe Sav. Bank. F.S.B. v. United States,* 59 Fed.Cl. at 96; *Anchor Sav. Bank, FSB v. United States,* 59 Fed.Cl. at 143; *Citizens Fin. Servs., FSB v. United States,* 57 Fed.Cl. at 73; *Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. at 134; *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. at 702; *Citizens Fed. Bank, FSB v. United States,* 52 Fed.Cl. at 563. In the case currently before this court, defendant argues that there are no factual disputes that prevent summary judgment regarding plaintiff's damages claim for lost profits. Defendant states that "even assuming plaintiff's factual assertions to be true, Mr. Stokes's report has an insufficient factual predicate upon which to frame and award damages for lost profits with reasonable certainty."

The court agrees that the factual predicate of any expert's opinion must find support in the record and that "mere 'theoretical speculations' lacking a basis in the record will not create a genuine issue of fact." *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1051 (Fed.Cir.2001). The conclusory testimony of an expert does not meet plaintiff's evidentiary burden. " '[T]he expert must set forth the factual foundation for his opinion... in sufficient detail for the court to determine whether that factual foundation would support a finding' " of damages. *Id.* (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.,* 216 F.3d 1042, 1047–48 (Fed.Cir. 2000)). As the Federal Circuit has stated, "[t]he necessity for such an explicit factual foundation should be self-evident." *Id.* Mr. Stokes' report and his hearing testimony fail to provide a sufficient factual foundation to support a finding of damages for lost profits that are reasonably certain.

The *Columbia First Bank* opinion relied on similar reasoning to reject plaintiff's damages claim for lost profits after a trial involving a damages model, although a different one from the one presented by Mr. Stokes in this case. The court found that plaintiff's damages model relied "on assumptions and calculations not rooted in Columbia's actual performance in the real world." *Columbia First Bank v. United States,* 60 Fed.Cl. at 125. For instance, as in the case before this court, the *Columbia First* court found that the types of assets in plaintiff's alleged "but-for" incremental assets portfolio were "speculative and unmoored in the factual evidence presented." *Id.* at 115. In addition, as in this case, plaintiff failed to prove that its alleged incremental assets portfolio would have been profitable. *Id.* at 125. The court stated that "to meet the reasonable certainty standard plaintiff's damages model must ... be based on sufficient factual evidence, must use assumptions and calculations that are moored in that factual evidence, and must be credible ...." *Id.* at 107–08. The court concluded that plaintiff had failed to proffer sufficient evidence to estimate lost profits damages with reasonable certainty. *Id.* at 125.

Plaintiff claims that it will offer additional testimony at trial to support the "reasonableness of certain of Mr. Stokes's assumptions," including "Heritage's actual growth and leverage strategies it would have employed after FIRREA, the type and nature of the institutions Heritage was actually trying to acquire after FIRREA, including the asset/liability product-mixes of those institutions ... [and] potential profitable opportunities that existed for Heritage after FIRREA ...." Defendant claims that testimony on those topics would not serve to bolster Mr. Stokes' methodology or plaintiff's lost profits claim because Mr. Stokes' "methodology, by his own admission, is not predicated upon the acquisition of any particular company or assets." As such, defendant asserts that "there exists no meaningful nexus between any potential fact testimony and his model."

The court agrees with defendant. Since Mr. Stokes' expert report and model do not result from a thorough examination and study of detailed and specific facts, testimony on such facts cannot support his model. The defendant is correct that, even presuming additional testimony by Heritage as to the assets and liabilities Heritage allegedly would have acquired but for the government's breach, Mr. Stokes' model remains "an insufficient vehicle for measuring damages." Therefore, the court grants defendant's motion for summary judgment on plaintiff's damages claim for lost profits. This result is consistent with the Federal Circuit's recent guidance that, "[e]xpectancy damages theory, based on lost profits, has proven itself impractical for these cases, and generally not susceptible to reasonable proof.... [G]iven the speculative nature of such a damages claim, ... experience suggests that it is largely a waste of time and effort to attempt to prove such damages." *Glendale Fed. Bank v. United States,* 378 F.3d at 1313 (citations omitted).

### B. Cost of Replacement Capital

*Plaintiff's Cost of Replacement Capital Model*

■ In his expert report prepared for the plaintiff, Dr. Donald Kaplan claims that Heritage is entitled to damages in the amount of $69.9 million, which allegedly represents the hypothetical cost to Heritage to replace the $24.6 million in goodwill that was phased out by FIRREA. Dr. Kaplan employs a present-value, or discounted cash-flow model, which purports to calculate, as of the date of trial, the value of the lost supervisory goodwill capital by measuring Heritage's cost to replace the goodwill.

Dr. Kaplan's model is based on a hypothetical preferred stock issuance by Heritage in 1989, which generates cash proceeds that replace the supervisory goodwill capital eliminated by FIRREA. The model, therefore, begins with the $24.6 million of remaining unamortized goodwill capital as of December, 1989. In order to replace the goodwill capital, Dr. Kaplan assumes that Heritage hypothetically issued $24.6 million of preferred stock in 1989, with transaction costs of $1.5 million. The model also assumes that preferred stock investors were paid a 20 percent dividend annually for 22 years, which purportedly measures the cost Heritage would have incurred to sell the $24.6 million in preferred stock in 1989.

Dr. Kaplan derived the 20 percent return from the actual investment return expected on the common stock in the bank's 1989 conversion. Dr. Kaplan explained that in Heritage's August, 1989 conversion, Heritage raised $21.9 million in gross cash proceeds and projected that a 22 percent return would be paid to its common stockholders. For purposes of the replacement capital model, Dr. Kaplan rounded this percentage down to 20 percent.

In his testimony at the hearing, Dr. Kaplan explained that the "preferred stock model is structured to mimic or replicate the outstanding goodwill amounts over time and that captures the amortization of the goodwill." Therefore, the model reduces the outstanding amount of the preferred stock capital to mirror the contractual 25-year amortization schedule of the supervisory goodwill. The model also reduces the dividend yield on the preferred stock annually in recognition of the fact that supervisory goodwill was a non-earning, intangible capital asset. According to Dr. Kaplan, the total accumulation of the 20 percent yield on the remaining balance of the amortizing $24.6 million of preferred stock over the remaining 22-year contract term represents the gross cost Heritage would incur to replace the value of the lost supervisory goodwill.

Dr. Kaplan then reduced the dividend cost by 5.44 percent each year to compensate for the fact that the cash proceeds from the sale of the preferred stock, unlike the supervisory goodwill, could be invested to earn additional income. The 5.44 percent was derived from Heritage's conversion prospectus, which indicated that conversion proceeds would be invested at a 5.44 percent rate of return after taxes. Dr. Kaplan, therefore, credited the government the difference in value between cash and goodwill by assuming the cash was

invested for general corporate purposes and earned an annual return of 5.44 percent.

For each year of the model, Dr. Kaplan netted the preferred stock dividend, which is paid out at 20 percent, and the credited income on the stock proceeds, assumed to be 5.44 percent, to calculate an annual cost. Dr. Kaplan then added all yearly costs through 1999, his assumed trial date, with all post–1999 costs, which he discounted back to 1999 dollars at a rate of 5.45 percent based on the one-year Treasury bond yield as of October, 1999, to produce a total cost amount of $39.8 million.

In addition, Dr. Kaplan included in the calculation estimated transaction costs of 6 percent attributable to raising the preferred stock capital, such as legal, accounting, and investment banking fees. The transaction costs in the model were based on the transaction costs Heritage actually incurred in raising capital in its 1989 conversion, which was approximately 15 percent of the amount of capital raised. Dr. Kaplan reduced that percentage to 6 percent because, in his view, 6 percent represented a more accurate estimate of the transaction costs of a preferred stock offering, as opposed to a mutual-to-stock conversion.

Based on three months of 1999 tax information, Dr. Kaplan then grossed up the total costs due to the 43 percent tax rate that Dr. Kaplan claims plaintiff will be required to pay on any cost of replacement capital damages award. According to Dr. Kaplan's model, plaintiff is entitled to $69.9 million in cost of replacement capital damages.[16]

Defendant argues that Dr. Kaplan's hypothetical "cost of replacement" methodology is fundamentally flawed. According to the defendant, since plaintiff did not attempt to obtain substitute performance, it should not

be permitted to recover the costs it allegedly would have incurred had such an attempt been made. In other words, since plaintiff never replaced its goodwill capital, it did not incur any actual mitigation costs, negating the applicability of Dr. Kaplan's model.

Plaintiff concedes that Heritage did not replace the supervisory goodwill eliminated by the breach. However, plaintiff argues that Heritage is not seeking to recover the costs it incurred in replacing the lost capital, rather, it is seeking to recover the value of the asset that defendant took from it, measured by the estimated cost of replacing it. Dr. Kaplan, therefore, attempts to distinguish his model from similar models that have been rejected in other cases by claiming his model is a "valuation methodology." In other words, Dr. Kaplan claims that he is attempting to "determine the value to lost goodwill," as opposed to the cost to replace the goodwill. Defendant argues that plaintiff's "valuation" theory is a distinction without a difference.

In *LaSalle Talman,* the Federal Circuit endorsed the replacement capital model, recognizing that " 'the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill,' . . . ." *LaSalle Talman Bank v. United States,* 317 F.3d at 1374 (quoting *LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64, 103 (1999)); *see also Long Island Sav. Bank v. United States,* 60 Fed.Cl. at 95; *Citizens Fed. Bank v. United States,* 59 Fed. Cl. 507, 518 (2004); *Globe Sav. Bank v. United States,* 59 Fed.Cl. at 97 ("The Federal Circuit in *LaSalle Talman* held that 'the cost of replacement capital can serve as a valid

---

**16.** Alternatively, in his report, Dr. Kaplan also calculated Heritage's alleged cost of replacement capital assuming that the capital raised in Heritage's actual mutual-to-stock conversion in 1989 was intended to replace the phased out goodwill, although Dr. Kaplan does not claim it was intended for that reason. The alternative calculation employs the same methodology as the cost of replacement calculation outlined above. Under the alternative calculation, Dr. Kaplan concluded that Heritage should be reimbursed $46.7 million

for the capital raised in the conversion ($82 million after grossing up for taxes), the amount he contends the conversion actually cost Heritage. Apparently, Dr. Kaplan's alternative calculation was abandoned by the plaintiff because it was not presented at the hearing, nor in plaintiff's post-hearing brief. The approach agreed upon prior to the hearing was to explore fully the expert's methodologies at the hearing and to explore the susceptibility of plaintiff's damages theories to summary judgment.

theory for measuring expectancy damages in the *Winstar* context,' where a plaintiff's actual experience raising capital could be used to determine cost of capital.").

This court "has almost uniformly rejected hypothetical cost-of-replacement capital claims" similar to the one before this court due to the failure to reflect costs actually incurred by the thrift. *Globe Sav. Bank v. United States*, 59 Fed.Cl. at 96; *see Long Island Sav. Bank v. United States*, 60 Fed. Cl. at 95–96; *Granite Mgmt. Corp. v. United States*, 58 Fed.Cl. 766, 777 (2003); *Anchor Sav. Bank v. United States*, 59 Fed.Cl. at 159; *Citizens Fin. Servs., FSB v. United States*, 57 Fed.Cl. at 71–72; *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. at 243–44; *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. at 135–139; *Columbia First Bank, FSB v. United States*, 54 Fed.Cl. at 697–700; *Bank United of Tex., FSB v. United States*, 50 Fed.Cl. at 654–655; *Landmark Land Co. v. United States*, 46 Fed.Cl. 261 (2000), *aff'd in part, vacated in part, rev'd in part*, and *remanded sub nom. Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed.Cir.2001); *LaSalle Talman Bank v. United States*, 45 Fed.Cl. at 103–104; *Cal. Fed. Bank v. United States*, 43 Fed.Cl. 445, 461 (1999), *aff'd in part, vacated in part*, and *remanded*, 245 F.3d 1342 (Fed.Cir.2001), *cert. denied* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002) and *cert. denied sub nom. United States v. California Fed. Bank, FSB*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002); *Glendale Fed. Bank, FSB v. United States*, 43 Fed.Cl. at 401–402; *cf. Citizens Fed. Bank v. United States*, 59 Fed.Cl. at 518 ("In the present case, Citizens' costs are based on actual costs associated with the exchange. Citizens' costs are unlike the inflated hypothetical costs of replacement rejected in other *Winstar* related cases."); *Home Sav. of Am., FSB v. United States*, 57 Fed.Cl. 694, 728 (2003) (finding that the cost of replacement capital model satisfied the requirement of reasonable certainty because the model was based on an actual, not hypothetical, stock offering); *So. Nat'l Corp. v. United States*, 57 Fed.Cl. at 309–10 (denying defendant's summary judgment motion on plaintiffs' cost of replacement capital claim, in part, because "perhaps realizing the futility of presenting a purely hypothetical model as a measure of damages, plaintiffs argue" that their model "'measured an actual cost that [First Federal] incurred-the diminution in value of its deposit insurance.'"). Indeed, in several of these cases, the court rejected hypothetical cost of replacement capital models on summary judgment. *See Long Island Sav. Bank v. United States*, 60 Fed.Cl. at 95–96; *Globe Sav. Bank v. United States*, 59 Fed.Cl. at 97; *Granite Mgmt. Corp. v. United States*, 58 Fed.Cl. at 777; *Anchor Sav. Bank v. United States*, 59 Fed.Cl. at 159; *Citizens Fin. Servs., FSB v. United States*, 57 Fed.Cl. at 72; *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. at 243–44; *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. at 138; *Columbia First Bank, FSB v. United States*, 54 Fed.Cl. at 699.

As this strong body of case law demonstrates, the theory that hypothetical models for preferred stock can be employed to calculate the cost of replacement capital for goodwill lost through the enactment of FIRREA has been repeatedly rejected. "As numerous judges of this Court have found, 'plaintiff's damages should be calculated on the basis of the actual means by which it filled its capital deficit.'" *Long Island Sav. Bank v. United States*, 60 Fed.Cl. at 95 (quoting *Commercial Fed. Bank v. United States*, 59 Fed.Cl. at 358). For instance, "the proper measure of a plaintiff's damages in replacing supervisory goodwill with real capital" has been found to be "the transactional costs it incurred in raising that capital." *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. at 139.[17]

---

17. *See also Citizens Fed. Bank v. United States*, 59 Fed.Cl. at 517–18 ("Floatation costs, or transaction costs, associated with the cost of replacement capital have been awarded as damages, while inflated hypothetical costs of capital have not. Although Citizens should be able to recover the transaction costs associated with its ability to replace its supervisory goodwill and capital credit, Citizens asks this Court to consider not only its transaction costs, but also the negative tax consequences it suffered as a result of the exchange. In *Home Savings of America*, Judge Bruggink examined the ability of Plaintiff to seek to recover costs of replacement capital in light of the cases evaluating a claim for the cost of replacement capital .... But none of the above-

In other words, in *Winstar* cases, plaintiffs cannot recover damages under a cost replacement capital theory for costs they did not actually incur.

Applying this rule to the case brought by Standard Federal Bank, plaintiff cannot recover the hypothetical cost of replacing its supervisory goodwill because, as even the plaintiff concedes, it did not, in fact, raise capital to replace supervisory goodwill and, therefore, it did not actually incur any such related costs. Indeed, during the hearing, Dr. Kaplan stated that he is not aware of any steps taken by Heritage to raise replacement capital. He also admitted that whether or not plaintiff actually incurred such costs is irrelevant to his model:

> Q. Did you ever ask them [Heritage corporate officers] that question and by that question I mean did Heritage consider raising capital after the breach?
>
> A. I may have, but I'm not recalling any particular discussion on that point and I'm not recalling any responses on that point. I simply don't recall discussions on that point.
>
> Q. And it would be irrelevant to your model whether or not they said yes, we did try or no, we didn't try, right?
>
> A. Yes, in the—yes, it would be irrelevant in the context of valuing the capital that was taken away.

Heritage's decision not to raise capital to replace the lost goodwill likely stems from the fact that the capital that was phased out by FIRREA was not necessary for Heritage to meet the minimum capital requirements. In other words, FIRREA never caused Heritage to fall out of capital compliance.

As defendant asserts, Dr. Kaplan's "methodology is unrelated (and no factual dispute could thus be created) to the essential questions of whether Heritage needed replacement capital, whether they wanted to raise capital, whether they tried to raise capital, and, even if Heritage needed and wanted capital, whether they needed to raise all of it immediately." In sum, since no capital was raised, no actual costs were incurred. Therefore, plaintiff's cost of replacement capital claim must fail. *See Cal. Fed. Bank v. United States*, 245 F.3d at 1350 ("We see no clear error in the [trial] court's factual finding that the flotation [i.e., transaction] costs provided an appropriate measure of Cal Fed's damages incurred in replacing the supervisory goodwill with tangible capital."); *Columbia First Bank, FSB v. United States*, 54 Fed.Cl. at 699 ("In this case, plaintiff both behaved reasonably and did not incur the cost of replacing capital. Plaintiff may have been damaged, and even badly damaged, by the breach, but that damage was neither caused nor increased by mitigation costs, and the court sees no reason to use hypothetical mitigation costs as a measure of damages now.") (citation omitted). As the defendant states, "[p]ermitting recovery for hypothetical substitute performance would create a windfall for Heritage, which did not incur any *actual* mitigation expenses." (emphasis in original); *Landmark Land Co. v. United States*, 46 Fed.Cl. at 274 (the preferred stock model "provide[s] a measure of damages that [the thrift] might have incurred had it chosen to replace the goodwill that was phased out according to the requirements of FIRREA. This did not happen though.").

Plaintiff's attempt to distinguish its model from other similar models that have been rejected by judges of this court by terming it a "valuation methodology" is merely a distinction without a difference. *See Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. at 134 (the court rejected plaintiff's hypothetical preferred stock model, which also was characterized by plaintiff as measuring "the value of the disallowed goodwill as measured by what it would have cost to replace it with real capital.").[18] As the defendant states:

---

cited cases found that costs in addition to transaction costs were legally barred. Rather, the claims for cost of replacement capital were rejected when they were not based on the *actual costs of replacement*." Thus, the Court rejected Defendant's assertion that the Court limit plaintiff's recovery to transaction costs as a matter of law. *Home Savings of America*, 57 Fed. Cl. at

708." (emphasis in original) (other citations omitted)).

18. In *Commercial Federal Bank v. United States*, the plaintiff presented a hypothetical cost of replacement capital model as "a reasonable approximation of the value of plaintiff's supervisory goodwill." *Commercial Fed. Bank v. United*

Whether one calls what Dr. Kaplan has done in this case a measurement of value, cost, cost of cover, or any other descriptive term or phrase, the substance of his methodology—a hypothetical measurement of the costs that Heritage would have incurred had it replaced the goodwill eliminated by FIRREA—does not change. And that substance... has been continually rejected... in the *Winstar*-related cases.

The court rejects plaintiff's attempt to relabel its hypothetical cost of replacement capital model, which has been repeatedly rejected by judges of this court, as a "valuation methodology," in an apparent attempt to forestall summary judgment on its claim. To support its position, plaintiff attempts to rely on *LaSalle Talman* and *Glass v. United States*. *LaSalle Talman Bank v. United States*, 317 F.3d at 1370; *Glass v. United States*, 47 Fed.Cl. 316, 327–329 (2000), *rev'd in part, vacated in part on other grounds*, and *remanded*, 258 F.3d 1349 (Fed.Cir.2001). Plaintiff's reliance on *LaSalle Talman* is particularly curious in that *LaSalle Talman* detracts from plaintiff's argument in lieu of bolstering it. While the Federal Circuit found that the Court of Federal Claims relied on an incorrect theory in ruling that damages could not be based on the cost of this capital, the court indicated that hypothetical models may not be used to determine the cost of replacing goodwill with tangible capital, stating:

> *States*, 59 Fed.Cl. at 356. The *Commercial Federal* court appeared to endorse such a theory, at least in dicta, stating:
>> Despite its rejection in other cases before the Court of Federal Claims, the court does not believe that the use of a hypothetical cost of replacement model is barred, as a matter of law, by any Federal Circuit precedent.... Supervisory goodwill is a notoriously difficult asset to value. One way to show the value of something lost is by reference to similar, more easily valued substitutes. In an appropriate case, the court may find that damages flowing from an actual breach, which caused an actual loss of supervisory goodwill, may most reliably be estimated by a model showing the hypothetical cost of replacing the goodwill with a similar asset.
> *Id.* at 358. However, as noted, this ostensible endorsement is apparently mere dicta because the court also stated that it "need not review the

The court conducted, but did not adopt a [replacement capital] calculation shown in Court Exhibit 4 wherein the cost of the $300 million replacement capital was entered at the 12% hurdle rate, less 7% described as the "assumed leverage ratio." We too do not adopt this calculation, for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach.

*LaSalle Talman Bank v. United States*, 317 F.3d at 1375; *see also Granite Mgmt. Corp. v. United States*, 58 Fed.Cl. at 777 ("As was explained in *LaSalle Talman*, where the court is confronted with a choice between relying on a hypothetical cost of replacement model or the thrifts' 'actual experience' in replacing supervisory capital, the court should rely on the latter."). In short, contrary to plaintiff's contention, the *LaSalle Talman* case does not support its claim.

The plaintiff also points to the *Glass* case, which, unlike the majority of cases from this court, adopted a cost of replacement capital model. The *Glass* case, however, has been rejected by a number of other cases. *See Long Island Sav. Bank v. United States*, 60 Fed.Cl. at 95 ("In more than a few cases, the Court has rejected the *Glass* model and similar hypothetical models where the institution mitigated by means other than raising capital."); *Anchor Sav. Bank v. United States*, 59 Fed.Cl. at 158–59; *Franklin Fed. Sav. Bank*

merits of this damages theory because it has settled on reliably certain damages based on plaintiff's lost profits model." *Id.*

Moreover, although the *Commercial Federal* court included dicta acknowledging the hypothetical replacement capital model as a "valuation methodology," it also recognized, in support of its damages award based on lost profits, that hypothetical models are inconsistent with the precedent of this court and the Federal Circuit. For instance, the *Commercial Federal* court quoted *LaSalle Talman* for the proposition that "'plaintiff's damages should be calculated on the basis of the actual means by which it filled its capital deficit.'" *Id.* Additionally, the *Commercial Federal* court quoted *Granite Management* for the assertion that "'where the court is confronted with a choice between relying on a hypothetical cost of replacement model or the thrift[]'s actual experience ... the court should rely on the latter.'" *Id.*

*v. United States*, 55 Fed.Cl. at 137; *Columbia First Bank v. United States*, 54 Fed.Cl. at 699. This court believes that the *Glass* case is the exception, rather than the rule, and declines to follow it. As the *Anchor* court stated:

> this court refuses to side with *Glass* and instead aligns itself with the myriad other cases rejecting models similar to the one plaintiff puts forward. This court, except for *Glass*, which was decided well-before the spate of current more mature *Winstar* cases, has repeatedly rejected "a hypothetical cost of replacement capital model, when, in fact, the thrift pursued another strategy."

*Anchor Sav. Bank v. United States*, 59 Fed. Cl. at 159.

Given this court's rejection of plaintiff's hypothetical cost of replacement capital model, the court need not address defendant's other arguments that Dr. Kaplan's model renders the lost goodwill more valuable than cash and that he overstates the amount of goodwill to be replaced. Despite plaintiff's offer to provide additional testimony at trial, plaintiff's proposed "additional testimony" will only serve to bolster Dr. Kaplan's methodology and conclusions, which have been fully articulated and explained in a hearing before this court. Moreover, the court has not found any disputed issues of material fact. Based on Dr. Kaplan's prior comprehensive testimony regarding his model, as well as the case law from this court and the Federal Circuit, the court rejects plaintiff's claim for cost of replacement capital and grants defendant's motion for summary judgment on this claim.

## II. Reliance Damages

■ The Federal Circuit has stated that " '[t]he purpose of reliance damages is to compensate the plaintiff "for loss caused by reliance on the contract." ' " *Castle v. United States*, 301 F.3d 1328, 1341 (Fed.Cir.2002) (quoting *Landmark Land Co. v. FDIC*, 256 F.3d at 1379), *reh'g and reh'g en banc denied* 64 Fed.Appx. 227 (Fed.Cir.2003), *cert. denied* 539 U.S. 925, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003). This result is accomplished by restoring the non-breaching party to " 'as good

a position as he would have been in had the contract not been made....' " *Glendale Fed. Bank, FSB v. United States*, 54 Fed.Cl. 8, 11 (2002) (quoting Restatement (Second) of Contracts § 344(b)), *aff'd*, 378 F.3d 1308. As the Federal Circuit explained in *Glendale*, "[t]he underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1382. Since the critical event in assessing reliance damages is the breach itself, as opposed to the time of contracting, "damages are available for injuries resulting from activities that occurred either before or after the breach." *Id.* at 1383; *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 549 (2003). The "non-breaching party 'may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.' " *Hansen Bancorp, Inc. v. United States*, 367 F.3d at 1309 (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed.1998) (cited in *Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1383)). However, "[a]ny benefit retained from the expenditures made in reliance on the contract must be offset against the injured party's damages." *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. at 549.

■ The Federal Circuit has stated that in the *Winstar* context, reliance damages "provide a firmer and more rational basis [for measuring the losses actually sustained]." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1383; *S. Nat'l Corp. v. United States*, 57 Fed.Cl. at 299 ("Reliance damages are intended to compensate a party that sustained actual losses as a result of the other party's breach." (citing *Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1382–1383)). Recently, the Federal Circuit further expounded on the theory of reliance damages in *Winstar* cases, stating:

> Reliance damages, however, are supportable when based on actual losses that are fully proven. "Reliance is an ideal recovery in *Winstar* cases. Despite the land-

scape where alternative forms of recovery are speculative and loss models inherently unreliable, reliance damages can be ascertainable and fixed." Proof of reliance damages are factual determinations to be made by the trial court on the basis of the evidence presented by the plaintiff thrifts. *Glendale Fed. Bank v. United States,* 378 F.3d at 1313 (footnote omitted). As in the case of damages for lost profits, to recover reliance damages, "a plaintiff must also show that: (1) its losses were reasonably foreseeable at the time of the contract; (2) the breach was a substantial factor in causing its losses; and (3) it has proven its losses with reasonable certainty." *Id.*

■ According to Dr. Kaplan in his expert report, in plaintiff's model, reliance damages "[r]eimburse the net cost and detriments incurred in preparing for and performing a contract." Plaintiff's reliance damages model is based on the theory that reliance damages equal the cost incurred by plaintiff less the benefits received. To determine the "cost incurred by plaintiff," Dr. Kaplan assumes that the net liabilities assumed by Heritage from Family Federal, $36.9 million, is a "cost." To determine the "benefits received by plaintiff," Dr. Kaplan then subtracts the $12.9 million in cash contributed by FSLIC to Heritage in conjunction with its acquisition of Family Federal. This calculation generates reliance damages in the amount of $24 million.

Defendant maintains that "[t]he Federal Circuit and this court have uniformly rejected claims that damages are measured by goodwill recorded or the net liabilities assumed." The defendant also maintains that Dr. Kaplan's reliance damages methodology is not legally sufficient for four reasons: (1)The breach did not cause reliance damages; (2) Dr. Kaplan's reliance damages methodology improperly counts the net liabilities assumed by Heritage as a cost; (3) Dr. Kaplan's reliance damages methodology improperly excludes appropriate benefits; and (4) Dr. Kaplan's reliance damages methodology does not calculate actual losses sustained.

Plaintiff claims that defendant has failed to show that it is entitled to summary judgment with respect to plaintiff's claim for reliance damages. Plaintiff asserts that the Federal Circuit's rejection of damages claims based on the assumption of net liabilities in *Glendale* applies only in the context of restitution damages, not reliance damages.

The court agrees with the defendant that the judges of this court and the Federal Circuit have rejected claims that damages are measured by goodwill recorded or the net liabilities assumed. Measuring damages through the assumption of net liabilities has been rejected by the Federal Circuit in a restitution context in *Glendale* and *LaSalle Talman.* In *Glendale,* the Federal Circuit found the following with regard to restitution damages:

> Glendale supports the trial court's conclusion by arguing that Glendale's assumption of the market value of Broward's net liabilities was a benefit to the Government because Glendale thus relieved the Government of its imminent responsibility for those liabilities. Glendale also argues that Broward's net liabilities were Glendale's costs of the merger because when Glendale performed in November 1981, all of the liabilities assumed from Broward immediately became legally binding obligations of Glendale.

> \*   \*   \*   \*   \*   \*

> This case, then, presents an illustration of the problem in granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld. . . .

*Glendale Fed. Bank v. United States,* 239 F.3d at 1381–82. In *LaSalle Talman,* the Federal Circuit stated that:

> the treatment of assumed "goodwill" liabilities as a cost of performance was generally resolved in *Glendale,* 239 F.3d at 1382–83, where this court held that damages are not properly keyed to "a liability that was at most a paper calculation." Although the

assumed liabilities are indeed an accounting cost... they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages.

*LaSalle Talman Bank v. United States,* 317 F.3d at 1376 (citation omitted); *see also Glendale Fed. Bank v. United States,* 378 F.3d at 1313 ("Restitution as a generalized theory for recovery of assumed benefits to the Government, based on non-provable paper costs, has been rejected ...." (citing *LaSalle Talman Bank v. United States,* 317 F.3d at 1376–77)). In addition, in *LaSalle Talman Bank,* the Federal Circuit "recognized that when restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages." *Glendale Fed. Bank v. United States,* 378 F.3d at 1313 (citing *LaSalle Talman Bank v. United States,* 317 F.3d at 1376).

Based on this language, some judges of this court have directly applied this restitution damages analysis in the context of reliance damages in awarding defendant summary judgment on plaintiff's reliance claim based on the assumption of net liabilities. For instance, in *Southern National Corporation,* the court stated:

> First,... the *Glendale* court ruled that a restitution award could not be premised on the principle that plaintiff thrift conferred a benefit on the Government in an amount equal to the assumed net liabilities of the acquired institution. In *Cal Fed* the appeals court, on the same grounds cited in *Glendale,* affirmed the denial of a restitution claim identical to the one rejected in *Glendale.* In *LaSalle Talman,* the Federal Circuit stated that restitution, when premised on the recovery of costs expended by the non-breaching party in performing the contract, "can be viewed as a form of reliance damages." Thus, this court interprets the Federal Circuit's prohibition against premising a restitution award on assumed net liabilities as applying with

equal force to a reliance calculation based on the same principle.

*S. Nat'l Corp. v. United States,* 57 Fed.Cl. at 300 (citations omitted); *Granite Mgmt. Corp. v. United States,* 58 Fed.Cl. at 776 ("If a restitution cost of performance claim premised on net liabilities assumed is precluded, and that claim 'can be viewed as a form of reliance damages,' it follows that a reliance claim based on net liabilities assumed is likewise barred."); *Fifth Third Bank of W. Ohio v. United States,* 55 Fed.Cl. at 245 ("[n]either *Glendale* nor *Cal Fed* stands for the proposition that the assumption of net liabilities constitutes an appropriate measure of reliance damages.").

This court agrees with the case law, cited above. The Federal Circuit's rejection of damages claims premised on the assumption of net liabilities in the restitution context also should be applied to the context of reliance damages. Indeed, logic precludes any other outcome. As the court stated in *Anchor Savings Bank v. United States:*

> What the *Glendale II* court made clear was that the value of lost supervisory goodwill could not be recovered in the restitution context. *Glendale II,* 239 F.3d at 1383 ("keying an award to liability that was at most a paper calculation, and which ignores the reality of subsequent events as they impacted on the parties, and particularly the plaintiff, is not justifiable."). In response to this, Anchor has taken Mr. Bankhead's calculations of restitution losses, and merely re-asserted them as reliance losses. Simply switching names, however, does not transform lost supervisory goodwill into recoverable damages because, as explained above, reliance costs must be *actual,* i.e. realized, if they are to be recovered.

*Anchor Sav. Bank v. United States,* 59 Fed. Cl. at 162 (emphasis in original); *see also Suess v. United States,* 52 Fed.Cl. at 231 n. 11 ("[T]he body of plaintiffs' belated reliance claim—based on plaintiffs' calculation of the value of the assumption of liabilities... is no different than the basis of the restitution claim and is therefore equally flawed.").[19] In

---

**19.** This reasoning is particularly relevant because the plaintiff, in this case, as in *Anchor Savings*

*Bank* and *Suess,* repackaged its restitution claim, based on the assumption of net liabilities, into a

any event, even if this logical leap from the restitution to the reliance context cannot be made, plaintiff's reliance claim still fails under *Glendale's* holding with regard to reliance damages, itself. As noted, the Federal Circuit in *Glendale* stated that: "The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for *any losses actually sustained* as a result of the breach of that promise." *Glendale Fed. Bank v. United States,* 239 F.3d at 1382. (emphasis added). The Federal Circuit has since elaborated on that statement, asserting that "[h]owever denominated, the focus of a recovery based on the reliance interest is the real costs incurred for capital and services that the thrift would not have incurred but for the contract and its subsequent breach." *Glendale Fed. Bank v. United States,* 378 F.3d at 1311. Based on the Federal Circuit's ruling, that reliance damages must be based on "losses actually sustained," judges of this court have rejected *Winstar* plaintiffs' reliance claims premised on the assumption of net liabilities for failing to meet this standard.

For instance, on remand from the Federal Circuit, in *Glendale Federal Bank,* the court found that the plaintiff "failed to persuade the court that its reliance damage model shows any 'actual losses sustained by plaintiff as a result of the Government's breach.'" *Glendale Fed. Bank v. United States,* 54 Fed.Cl. at 13 (quoting *Glendale Fed. Bank v. United States,* 239 F.3d at 1383). Specifically, the court stated:

> The bottom line is that plaintiff's model for calculation of Florida losses relies on treating the assumption of [the acquired thrift's] liabilities as a cost, or initial investment.... [Plaintiff expert's] analysis is premised on treating the initial supervisory goodwill figure—that is, the mark-to-

market value of [the acquired thrift's] excess liabilities—as [plaintiff's] principle [sic] cost or investment. The central point is that [plaintiff expert's] report does not offer an accurate accounting of the actual losses [plaintiff] sustained in operating the [acquired thrift's] franchise. Stated differently, it does not serve as an accurate measure of the total amount of cash spent [in operating the acquired thrift's franchise], less the total amount of cash received [in operating the acquired thrift's franchise]. Rather, it measures the market value of the assumed liabilities as a cost, but does not answer the question of whether [plaintiff] was called upon to pay a net cash outlay in the amount of the assumed excess liabilities. The court is cognizant of the cases cited by plaintiff that hold that a contractually-binding assumption of a debt not yet due is a cost for purposes of contract damages. But the court is also aware that the framework for the calculation of reliance damages as articulated by the Federal Circuit focuses on actual out-of-pocket losses, not paper calculations of losses.... But the law of the case on this point is clear: plaintiff's assumption of Broward's deficit was not a cost.

*Id.* at 13–14.

Similarly, in *Anchor Savings Bank,* the court found that plaintiff could not recover reliance damages as a matter of law due to its failure to proffer "specific, actual, realized losses":

> *Glendale III* makes clear that the focus in a reliance damages inquiry is on an *actual* "net cash outlay." This court reads that to mean a specified realized loss—an actual cash outlay, a payment made, a concrete and measurable cost. These types of losses are to be distinguished

---

reliance claim after the first *Glendale* decision by the Federal Circuit. *Glendale Fed. Bank v. United States,* 239 F.3d at 1374. In its brief, defendant states the following in a footnote:

> Dr. Kaplan's initial report in this case contained a claim for restitution based upon the net liabilities assumed by Heritage. After the Federal Circuit's *Glendale* decision, plaintiff moved this Court for leave to file a supplemental report on reliance damages "[i]n light of

the Federal Circuit's decision in *Glendale.*" The reliance damages claim contained in Dr. Kaplan's supplemental expert report simply repackaged his net liabilities restitution claim into a net liabilities reliance claim, apparently based upon a (mistaken) belief by plaintiff that the Federal Circuit in *Glendale* had endorsed such a claim.

(citations omitted).

from the paper losses that result when an acquiring company assumes the debts of its acquiree, and simply marks those debts down on its balance sheet in the red area. Until those debts are paid, they cannot constitute reliance damages.

Support for this court's requirement and reading of the term "actual cost" is found in the Federal Circuit's holding in *Glendale II*. There, the Federal Circuit not only said "reliance damages will permit a more finely tuned calculation of the *actual* costs sustained by plaintiff as a result of the government's breach," but thereafter provided examples of what "actual costs" are. The examples included increased OTS assessments, increased deposit insurance premiums, transaction costs and custodial fees. These types of payments are realized costs, and they are far different from the paper calculation which results when a company assumes the debt of an acquired entity.

*Anchor Sav. Bank v. United States*, 59 Fed. Cl. at 161 (citations omitted) (emphasis in original); *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed.Cl. at 631 (rejecting plaintiff's reliance damages claim for the assumption of net liabilities because "[f]irst, . . . we agree with Judge Miller's holding in *Fifth Third Bank* that the Federal Circuit has not endorsed this damage theory in *Winstar* cases. Second, and most importantly, the Institutional Plaintiffs presented very little evidence that it actually paid down these liabilities—an absolute requirement for reliance damages." (citation omitted)); *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. at 245–46 (granting summary judgment on plaintiff's reliance damage claim because "neither *Glendale* nor *Cal Fed* stands for the proposition that the assumption of net liabilities constitutes an appropriate measure of reliance damages. In *Glendale* reliance was calculated by aggregating specific costs, such as increased insurance premiums, increased OTS assessments, transaction costs, custodial fees, and lost historical cost of funds advantage over the bank's competitors. Indeed, *Glendale* states that the principle of reliance recognizes that 'a party who relies on another party's promise made binding through contract is entitled to damages for

*any losses actually sustained* as a result of the breach of that promise.' Plaintiff's calculation does not comport with the prescription set forth in *Glendale*." (citations omitted) (emphasis in original)).

Indeed, during the hearing before this court, Dr. Kaplan conceded that his model is not based on the "losses actually sustained" by Heritage, as required by the *Glendale* decision.

Q. Isn't it true that your report does not offer an accounting of the actual losses Heritage sustained in operating Family?

A. Yes.

Q. And isn't it true that your report does not serve as a measurement of the total amount of cash spent in operating Family, less the total amount of cash received in operating Family?

A. Yes.

In short, the failure of plaintiff's reliance damages model to measure "losses actually sustained" renders it deficient as a matter of law. *Glendale Fed. Bank v. United States*, 239 F.3d at 1382.

Plaintiff tries to rely on *Franklin Federal* for the proposition that it should be permitted to demonstrate at trial that the assumption of liabilities resulted in actual losses. In that case, the court allowed plaintiffs an opportunity, at trial, to "establish that their assumption of . . . excess liabilities under the goodwill contract led to concrete, measurable losses when the enactment of FIRREA breached the contract." *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. at 120; *see also id.* at 121 (Plaintiffs "must do more than merely claim that the liabilities they paid off as a result of FIRREA 'required real expenditures.' At trial they must demonstrate when, to whom, and in what amounts those expenditures were made, and that FIRREA was the proximate cause of the expenditures." (citation omitted)). In *Citizens Financial Services*, the court also denied defendant's summary judgment claim, allowing a reliance claim based on net liabilities assumed to be presented at trial. *Citizens Fin. Servs. v. United States*, 57 Fed.Cl. at 70. Relying on *Franklin Federal*, the *Citizens* court stated that "if [plaintiff] can establish

that it incurred an actual economic cost when it assumed the net liabilities ... and that the cost was not completely offset by the benefit it received from acquiring [the thrift], [plaintiff] may be entitled to reliance damages." *Id.*

These cases, however, have been criticized for failing to "take the Federal Circuit's recent guidance into account." *S. Nat'l Corp. v. United States,* 57 Fed.Cl. at 300. As the *Southern National Corporation* court stated: "The *Citizens* court does not address *LaSalle Talman* in its analysis of plaintiff's reliance calculation, and *Franklin* was decided one week before the appeals court issued *LaSalle Talman.*" *Id.* As a result, the *Southern National* court concluded that "the approaches endorsed by these trial court decisions are not persuasive authority." *Id.; Granite Mgmt. Corp. v. United States,* 58 Fed.Cl. at 776–77 ("In addition, it is noteworthy that *Franklin Federal* preceded *LaSalle Talman.* Further, although *Citizens* was decided after *LaSalle Talman,* it neither referenced nor cited that case in its analysis of the plaintiff's reliance claim." (citations omitted)).

Even more significantly, after trial, the *Franklin Federal Savings Bank* court rejected plaintiffs' reliance damages claim for the same reason this court believes Heritage's claim for reliance damages should be rejected. In the case before this court, as in *Franklin Federal Savings Bank,* plaintiff's reliance damages claim fails to comport with the guidance articulated by the Federal Circuit in *Glendale,* 239 F.3d at 1382, which held that reliance damages must be based on "'losses actually sustained.'" *Id.; see also Franklin Fed. Sav. Bank v. United States,* 60 Fed.Cl. 55, 60 (2004) ("Here, there were no out-of-pocket losses and, thus, no reliance damages.").

Given the infirmities in Dr. Kaplan's methodology, the court need not address the defendant's remaining arguments with respect to reliance damages. In short, plaintiff's reliance claim, premised on the net liabilities it assumed, fails because such a claim is not recognized by the Federal Circuit and because plaintiff's model fails to account for the losses actually sustained by the thrift. Therefore, the court grants defendant's summary judgment motion with regard to plaintiff's claim for reliance damages.

## CONCLUSION

In the expert reports submitted to the court, and in the testimony of both experts at the mini-hearing, plaintiff had an opportunity to fully explain the damages theories upon which plaintiff based its damages claims. However, based on the binding precedent in the United States Court of Appeals for the Federal Circuit, as well as the interpretive guidance offered by other judges of this court, the undersigned finds the methodologies underlying plaintiff's claims for damages to be deficient as a matter of law. Therefore, the court GRANTS defendant's motion for summary judgment with respect to plaintiff's damages claims for lost profits and the cost of replacement capital, as well as plaintiff's claim for reliance damages.

**IT IS SO ORDERED.**